**YOSEMITE PARK AND CURRY COMPANY**

v.

**The UNITED STATES.**

No. 309–79C.

United States Court of Claims.

Aug. 11, 1982.

available to them under the mitigation provi-    sions of the code.

Richard A. Solomon, Washington, D. C., attorney of record, for plaintiff; Stuart F. Feldstein, Dennis Lane and Wilner & Scheiner, Washington, D. C., of counsel.

John W. Showalter, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant.

Before DAVIS, KASHIWA and SMITH, Judges.

SMITH, Judge:

Plaintiff operates food and accommodation services at Yosemite National Park (Yosemite) as a concessioner of the National Park Service (NPS). Under a long-term contract between NPS and plaintiff, NPS supplies all of plaintiff's electricity. Plaintiff contends that the rate structure used by NPS overcharged plaintiff in contravention of the contract terms and of applicable statutes and regulations. The Government maintains that its method of setting rates was reasonable and should be upheld. We find for the Government.

## I.

The facts have been stipulated by the parties. In 1963, plaintiff and NPS entered into a 30-year concession contract for the provision to the public of food and accommodation services in Yosemite. Because plaintiff's facilities are inside the park and the park is itself isolated, the Government has complete control over plaintiff's access to the basic utilities needed to operate its facilities. Consequently, the concession contract requires that NPS supply plaintiff with utilities, and throughout the life of the contract NPS has provided plaintiff with electrical, water and sewer, and solid waste disposal services. Section 6(a) of the contract states only that the rates charged be "reasonable."

At Yosemite, NPS obtained the electricity it provided to plaintiff from two sources. During the period in question, 1974 to 1980, about 60 percent (per year, on the average) of plaintiff's electricity was generated at a hydroelectric plant, owned and operated by NPS, in the park. The remaining 40 percent (approximately) was obtained by NPS from Pacific Gas & Electric Company (PG&E), the public utility company which supplies electricity to the Yosemite area. NPS distributed the PG&E electricity throughout the park on its own distribution grid.

The method NPS used to set electricity rates is, in its essential outline, straightforward. From 1974 to 1978, NPS based its charges on the rate schedule of PG&E. Beginning in 1978, NPS used instead the average of the rates of PG&E and two other area utility companies, Southern California Edison Company and Sierra Pacific Power Company. This rate-setting method may be called a comparative-rate system.

Included in the utility companies' rate schedules, of course, was their cost of energy, a combination of fossil fuels, nuclear energy, and hydroelectric power. Because of the rapid escalation of petroleum costs in the early 1970's, the California Public Utilities Commission (which regulates all of the aforementioned utility companies) began to separate out the energy costs in the published rates. This was called the energy cost adjustment clause (ECAC) and its amount varied from month to month with the cost of the fuel and the mix of fuels used during that period. For example, if hydroelectric power were used to a large extent in a particular month, the ECAC charge would generally be lower in that month relative to a month in which mostly fossil fuel was used. The ECAC was not a new charge—the cost of energy was always reflected in the rates—but it made more obvious the fluctuations in energy costs and the role played by energy costs in the final rate paid by the user.

Plaintiff points out that, while 60 percent of the electricity NPS supplied was purely

hydroelectric (from the NPS generator at Yosemite), NPS charged plaintiff as if 100 percent of the electricity were generated by a combination of hydro, nuclear, and fossil fuels. As a result, plaintiff says, it was overcharged for 60 percent of the electricity it used, because no nuclear or fossil fuel was used in its production.

In essence, plaintiff is arguing that a cost-based system should be used instead of the comparative-rate system. While plaintiff says it would accept the use of the utilities' rates as a starting point for calculating NPS rates, it insists that ultimately the NPS rates must bear a close relation to the actual cost to NPS. The legal question presented in this case is whether the contract and the relevant statutes and regulations require a cost-based system—that is, one whose validity rests ultimately on its relationship to the actual costs to NPS of producing the electricity—or whether a rational comparative-rate system is permissible.

## II.

### A.

The NPS rates in this case are governed by what might be described as several levels of authority. The most directly applicable level is the contract itself, section 6(a) of which states:

> The Secretary [of the Interior] shall furnish utilities to the Concessioner, when available, and *at reasonable rates to be fixed by the Secretary*[,] for use in connection with the operations authorized hereunder. [Emphasis supplied.]

The contract, however, offers no further definition of "reasonable rates."

The term "reasonable," by itself, could mean reasonable in relation to the Government's cost of providing the electricity; or, it could mean reasonable in relation to the rates plaintiff would otherwise have to pay to obtain the electricity from utility compa-

nies, in short, fair market value. The contract simply offers no basis for choosing between these meanings. Under the plain words of the contract, then, we cannot say that the NPS comparative-rate system is unreasonable.

■ Taken as a whole, section 6(a) points to a more definite meaning of "reasonable." The phrase "to be fixed by the Secretary" suggests that the parties contemplated an established procedure which would give meaning to the otherwise vague term "reasonable." As discussed at length below, there are such statutory and regulatory provisions for fixing these prices. Since, as we find, these provisions require a reasonable price to be set in either of the senses discussed above, it makes the most sense to read "reasonable rates" in section 6(a) of the contract to mean in accordance with the applicable statutes and regulations.[1] We therefore move on to those provisions.

### B.

The comparative-rate method used by NPS was established in a memorandum, dated January 24, 1973, from the Acting Director, Western Region. It provides:

> All charges for utility services require the application of sound business management practices. Accordingly, local rates will be established at *comparable commercial prices charged in the community* being used by the concessioner to support and justify the respective charges for meals or lodging or services provided the public. This policy is consistent with the intent of Congress (31 U.S.C. 483[a] ) and the Office of Management and Budget (Circular A–25) in that the resulting rate(s) will recover costs to the fullest extent possible and as fair and equitable, taking into consideration value to the recipient, public interest served, and other pertinent facts. [Emphasis supplied.]

There can be no question that the NPS practice of averaging local utility rates is in

---

1. We do not mean to belittle the direct effect of the contractual terms on the determination of rates in this case. Did we not conclude that the statutes and regulations require rates which are reasonable within the meaning of § 6(a), we would not hold that "reasonable" means in accordance with the statute and regulations.

accordance with this policy memorandum, and plaintiff does not contend otherwise.

The basic statutory authority for the provision by NPS of electricity to concessioners is found in the organic act of the National Park System.[2]

> In order to facilitate the administration of the National Park System, the Secretary of the Interior is authorized to carry out the following activities, and he may use applicable appropriations for the aforesaid system for the following purposes:
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (4) Utility services for concessioners; reimbursement
>
> Furnishing, *on a reimbursement of appropriation basis*, all types of utility services to concessioners, contractors, permittees, or other users of such services, within the National Park System: *Provided*, That reimbursements for cost of such utility services may be credited to the appropriation current at the time reimbursements are received. [Emphasis supplied.]

Plaintiff argues that the italicized words are, so to speak, words of limitation rather than words of purchase. That is, plaintiff asserts that NPS cannot charge more for electricity than would reimburse its cost of providing it. The Government argues, to the contrary, that reimbursement is the minimum that NPS should receive.

█ The legislative history of section 1b(4) makes it fairly clear that the Government's position is the correct one, or at least that plaintiff's position is not the correct one. Concern about overcharging concessioners had nothing to do with the enactment of section 1b(4); concern about un-

dercharging by the Government was the central theme. The only substantive comments on paragraph (4) are in letters from the Secretary of the Interior to the respective committee chairmen, recommending approval of paragraph (4). In both letters the Secretary stresses the tremendous postwar increase in use of the parks, the unnecessary expense of NPS generating all of its own electricity, and the efficiency of NPS buying its electricity elsewhere and charging for the cost of obtaining and distributing it.[3] The expressed concern is with recovering the costs at all, not with recovering too much.[4] In fact, the real purpose of paragraph (4) is to authorize accounting procedures which permit straightforward reimbursement of the cost of providing electricity instead of the "involved" procedures that NPS previously had had to use.[5] It may be concluded that the phrase "on a reimbursement of appropriation basis" refers to the *minimum* amount which Congress wanted NPS to charge. This reading of section 1b(4) also brings it into better harmony with the Independent Offices Appropriations Act, discussed below, which was also concerned with adequate reimbursement to the Government. The two statutes being *in pari materia*, the interpretation is preferred which best harmonizes them.[6] The rates imposed in this case do not conflict with the NPS regulations or statutes governing the contract.

### C.

The Department of the Interior, of which NPS is part, is subject to statutes and regulations which set fiscal policy for the entire Government. The regulation applicable to this contract is Bureau of the Budget Circu-

---

**2.** 16 U.S.C. § 1b(4) (1976).

**3.** H.R.Rep.No. 116, 83d Cong., 1st Sess. 3 (1953) (letter of Secretary of the Interior); S.Rep.No. 723, 83d Cong., 1st Sess. 4, *reprinted in* 1953 U.S.Code Cong. & Ad.News 2240, 2242 (letter of Secretary of the Interior).

**4.** *Id.*

**5.** S.Rep.No. 723, *supra* note 3, at 2 (committee statement) and at 4 (Secretary's letter), 1953

U.S.Code Cong. & Ad.News at 2241, 2242; H.R. Rep.No. 116, *supra* note 3, at 3.

**6.** *See Haig v. Agee*, 453 U.S. 280, 300–01, 101 S.Ct. 2766, 2778–79, 69 L.Ed.2d 640 (1981); *Estate of Sanford v. Commissioner*, 308 U.S. 39, 44, 60 S.Ct. 51, 56, 84 L.Ed. 20 (1939); *Cohen v. United States*, 181 Ct.Cl. 400, 406, 384 F.2d 1001, 1004 (1967); *Kleinfelter v. United States*, 162 Ct.Cl. 88, 92–94, 318 F.2d 929, 931–32 (1963).

lar No. A–25,[7] which was cited in the NPS rate memorandum. It articulates the Government-wide policy with respect to charges for "all Federal activities which convey special benefits to recipients above and beyond those accruing to the public at large."[8] As it applies to the rates discussed here, Circular No. A–25 provides:[9]

> *Lease or sale.* Where federally owned resources or property are leased or sold, a *fair market value* should be obtained. Charges are to be determined by the application of sound business management principles, and so far as practicable and feasible in accordance with comparable commercial practices. *Charges need not be limited to the recovery of costs; they may produce net revenues to the Government.*
>
> \* \* \* \* \* \*
>
> In determining the charges for the lease and sale of Government-owned resources or property, [the agency shall] apply sound business management principles and comparable commercial practices. [Emphasis supplied.]

The provision of electricity to plaintiff is the sale of a federally owned resource. Therefore, Circular No. A–25 expressly does not require NPS to use a cost-based system; rather, it mandates a comparative-rate system based on the fair market value of the goods or services. The NPS rate system is in accordance with Circular No. A–25 and we must go to a higher level of authority if we are to discover a basis for a challenge to the NPS rates.

### D.

The statutory authority pursuant to which Circular No. A–25 was promulgated is the Independent Offices Appropriations Act, 1952 (IOAA),[10] which was also cited by the NPS rate memorandum. It is by reference to this statute that the NPS rates must ultimately be judged. It states:[11]

> It is the sense of the Congress that any work, service, publication, report, document, benefit, privilege, authority, use, franchise, license, permit, certificate, registration or similar thing of value or utility performed, furnished, provided, granted, prepared, or issued by any Federal agency \* \* \* to or for any person (including groups, associations, organizations, partnerships, corporations, or businesses) \* \* \* shall be *selfsustaining to the full extent possible,* and the head of each Federal agency is authorized by regulation (which, in the case of agencies in the executive branch, shall be as uniform as practicable and *subject to such policies as the President may prescribe*) to prescribe therefor such fee, charge, or price, if any, as he shall determine, in case none exists, or redetermine, in case of any existing one, to be *fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts,* and any amount so determined or redetermined shall be collected and paid into the Treasury as miscellaneous receipts \* \* \*. [Emphasis supplied.]

Two things are apparent from the plain words of the statute: it gives only the most general indication of how fees and rates are actually to be set, and it applies to a wide variety of federal activities.

The IOAA is like section 1b(4) in the sense that its words themselves express no preference for a cost-based or a comparative-rate system. The term "selfsustaining" is no more precise than "on a reimbursement of appropriation basis." In addition, the factors in the IOAA to be considered in rate-setting go far beyond simply reimbursement of cost, and there is no indication that the non-cost factors are intend-

---

**7.** Bureau of the Budget, Circular No. A–25 (Sept. 23, 1959) [hereinafter Circular No. A–25].

**8.** *Id.,* ¶ 2. Plaintiff does not challenge the applicability of Circular No. A–25 to these rates.

**9.** Circular No. A–25, ¶¶ 3(b), 4(e).

**10.** Independent Offices Appropriations Act, 1952, Pub.L.No. 82–137, § 501, 65 Stat. 290 (1951), codified at 31 U.S.C. § 483a (1976).

**11.** *Id.*

ed necessarily either to lessen or to enlarge the cost-based amount.

The legislative history of the IOAA is sparse and unilluminating in much the same way that the legislative history of section 1b(4) is. In general the reports simply repeat the provision without comment.[12] Congress' main concern was the transfer of costs:[13]

> The Committee is concerned that the Government is not receiving full return from many of the services which it renders to special beneficiaries. * * *

The problem addressed was undercharging by the Government; overcharging was not considered.[14] The concern only with undercharging precisely reflects the conclusions of a report prepared in the previous year concerning fees for special services.[15] There is no basis to conclude that the IOAA, by its own terms, precludes the NPS rate system at issue here.

[redacted] After examination of the relevant contractual, regulatory, and statutory provisions, we conclude that the NPS comparative-rate system was properly instituted. It was within the guidelines provided by the IOAA and Circular No. A–25, and it was therefore "reasonable" within the meaning of the contract.

## III.

Plaintiff, however, raises the objection that the IOAA is not to be construed so broadly, relying upon a series of cases which describe the IOAA's application to licensing fees. These cases, *National Cable Television Ass'n v. United States*[16] *(National Cable I)* and *Federal Power Comm'n v. New England Power Co.*[17] and their progeny, limit agency discretion in setting licensing fees and mandate a cost-based fee schedule. These cases, if applicable, would mean that the fair market value standard in Circular No. A–25 is contrary to the IOAA and therefore invalid. The Government in reply argues that an analogy should instead be drawn to the sale of surplus government property. Although admittedly the surplus property statute does not itself apply here, the Government argues that it demonstrates a policy that the Government can set whatever price it can get in the sale of its property.

### A.

In *National Cable I* the Supreme Court was presented with a Federal Communications Commission (FCC) fee schedule for cable television licenses. The FCC had charged each cable system a filing fee plus an annual fee of 30 cents per subscriber. The Court held that the IOAA must be narrowly construed to avoid constitutional difficulties. The danger was that the fee imposed by the FCC could become a tax and that the taxation power must not be broadly delegated by Congress to agencies.[18] The Court therefore read the IOAA to authorize only reimbursement of the cost of providing the license. The Court noted that the per-subscriber fee was unrelated to that cost and instead appeared to be a charge on income or ability to pay. It was thus in the nature of a tax. The fee, the Court concluded, must be based on the actual cost to

12. H.R.Rep.No. 384, 82d Cong., 1st Sess. 29–30 (1951); S.Rep.No. 418, 82d Cong., 1st Sess. (1951); H.R.Rep.No. 753, 82d Cong., 1st Sess. (1951) (conference report); H.R.Rep.No. 869, 82d Cong., 1st Sess. (1951) (conference report).

13. H.R.Rep.No. 384, *supra* note 12, at 2.

14. *Id.* at 3 ("authorize and encourage the charging or increasing of fees"; "to revise charges where present charges are too low").

The sole reference to § 501 in the debates follows this pattern, emphasizing FCC and ICC license and inspection fees. 97 Cong.Rec. 4809 (1951) (remarks of Rep. Yates).

15. S.Rep.No. 2120, 81st Cong., 2d Sess. 3, 15 (1950) (report of a special Committee on Expenditures in the Executive Departments).

16. *National Cable Television Ass'n v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974) [hereinafter *National Cable I*].

17. *Federal Power Comm'n v. New England Power Co.*, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974) [hereinafter *New England Power*].

18. *National Cable I*, 415 U.S. at 340–41, 94 S.Ct. at 1148–49.

the Government, not on the public policy or interest served.[19] It also noted that the FCC had not clearly distinguished between the benefit to the individual recipient of the license as opposed to the benefit to the industry at large or the public at large. Benefits in the latter category (industry or public) are also the subject of taxes, not fees.[20] *National Cable I* held that the FCC had identified clearly neither the cost basis of the fees nor the individual benefit, and it remanded to the agency.[21]

In *New England Power*, companion to *National Cable I*, the Court concentrated on the difference between individual and public benefit. That case involved annual assessments by the Federal Power Commission (FPC) on electric utilities and natural gas companies, designed to defray the general administrative expenses of the agency. The FPC fees were set aside because they were justified only by general public or industry benefit and were for general governmental expenses. They were therefore in the nature of taxes.[22]

Our primary concern here is with the *National Cable I* case which discussed the basis of fees, as it is clear that plaintiff received an individual benefit within the meaning of *New England Power*.[23] *National Cable I* was first applied in a group of four FCC fee cases decided in the District of Columbia Circuit in 1976.[24] It has since been applied to fees for bank examinations by the Comptroller of the Currency,[25] applications for rights of way on Government property,[26] nuclear power plant licenses,[27] preparation of environmental impact statements,[28] copying charges,[29] and Freedom of Information Act requests.[30] Putting to one side for a moment the differences between the electricity rates in the instant case and the fees in *National Cable I*, we turn to the more recent IOAA cases to determine the standards for calculating the amounts of fees.

The cost standard laid down by the Supreme Court refers to those direct and indirect costs to the Government of the licensing process; it does not refer to the ultimate value to the recipient, *i.e.*, the profits made possible by the license.[31] The cases have consistently recognized that the calculation of the Government's costs is not an exact science. The District of Columbia

19. *Id.* at 341–43, 94 S.Ct. at 1149–50. The Court read "value to recipient" in the IOAA to mean cost to the Government. *Id.*

20. *Id.* at 343–44, 94 S.Ct. at 1150.

21. *Id.* at 344, 94 S.Ct. at 1150.

22. *New England Power*, 415 U.S. at 348–51, 94 S.Ct. at 1153–55.

23. The existence of an incidental public benefit (in this case, accommodations and food service to park visitors) does not overcome the individual nature of the benefit to plaintiff's business of being supplied with electricity. *Electronic Indus. Ass'n v. F.C.C.*, 554 F.2d 1109, 1115 (D.C.Cir.1976).

24. The four FCC cases decided in the District of Columbia Circuit in 1976, and virtually all of the more recent ones, deal mainly with the allocation of Government costs between individual and public benefit; that is, they deal with the basis of the fee rather than the calculation of its amount. *National Cable Television Ass'n v. F.C.C.*, 554 F.2d 1094 (D.C.Cir.1976) [hereinafter *National Cable II*]; *Electronic Indus. Ass'n*, 554 F.2d 1109; *National Ass'n of Broadcasters v. F.C.C.*, 554 F.2d 1118 (D.C.Cir. 1976); *Capital Cities Communications, Inc. v.*

*F.C.C.*, 554 F.2d 1135 (D.C.Cir.1976). As that is not an issue in this case, we do not discuss the main thrust of those cases.

25. See *First Nat'l Bank v. Smith*, 445 F.Supp. 1117 (D.Minn.1977).

26. See *Alyeska Pipeline Serv. Co. v. United States*, 224 Ct.Cl. ——, 624 F.2d 1005 (1980); *Colorado-Ute Elec. Ass'n v. Watt*, 533 F.Supp. 197 (D.Colo.1982); *Public Serv. Co. v. Andrus*, 433 F.Supp. 144 (D.Colo.1977).

27. See *Mississippi Power & Light Co. v. U. S. Nuclear Regulatory Comm'n*, 601 F.2d 223 (5th Cir. 1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1066, 62 L.Ed.2d 787 (1980).

28. See *Alumet v. Andrus*, 607 F.2d 911 (10th Cir. 1979); *Nevada Power Co. v. Watt*, 515 F.Supp. 307 (D.Utah 1981).

29. See *Reinoehl v. Hershey*, 426 F.2d 815 (9th Cir. 1970).

30. See *Diapulse Corp. of America v. F.D.A.*, 500 F.2d 75 (2d Cir. 1974).

31. *National Cable II*, 554 F.2d at 1107.

Circuit has said that the fee must not "un-reasonably exceed[ ]" the value to the recipient; it should be a "reasonable approximation of the attributable costs."[32] The method of calculating the fee must bear a "reasonable relation" to the cost of the services rendered.[33] At least one district court (Colorado) also speaks in terms of a reasonable relation.[34]

■ The Fifth Circuit, in *Mississippi Power & Light Co. v. U. S. Nuclear Regulatory Comm'n*, adopted less strict language:[35]

> We find the Commission's formula to be a *reasonable method* of estimating such fees. Notwithstanding the petitioner's assertion to the contrary, the NRC in establishing its costs is only obligated to come forth with *reasonable approximations*, not precise calculations. [Emphasis supplied.]

To the same effect is Circular No. A–25, which was expressly approved by the Supreme Court in *New England Power*,[36] and which does not require slavish devotion to cost analysis for cost-based special services.[37]

> Costs shall be determined or estimated from the best available records in the agency, and new cost accounting systems will not be established solely for this purpose. * * *

Under the Supreme Court's interpretation of the IOAA in fee cases, cost must be the ultimate basis of fees, but the required relationship between fees and costs can be satisfied by a fee system which has a reasonable, not necessarily exact, relation to cost. Even if the fee cases apply to the instant case, then, plaintiff must show that the NPS method makes no reasonable approximation of cost.

**B.**

The fee cases, however, are not apposite. In *National Cable I* and *New England Power*, the Supreme Court said that it is an imposition in the nature of a tax when Congress creates the need for a license and then charges more to obtain the license than it costs the Government to issue it. Such a system goes beyond regulation—regulation is the registration, inspection, or allocation on which the license is based— and enters the realm of public policy by imposing additional costs—taxes. The Court held that taxes cannot be imposed by an administrative agency on the basis of a general delegation of power.[38]

In the present case, by contrast, the Government has not created the need for electricity, nor is the service provided a regulatory one. Plaintiff, to carry on its chosen business, would have to buy electricity in any case, anywhere, regardless of the ownership of the land on which it operates and regardless of the existence or lack of a scheme of regulation. That is, anyone in plaintiff's position, whether the grantor of the concession is the Government or a wholly private enterprise, would have to make arrangements to obtain electricity from the grantor.

This is the significance of the contract, which is the feature of this case that distinguishes it from the license fee cases. Plaintiff, because it wanted to pursue the hotel business in this area, chose to enter into a contract with the Government to buy electricity, and the Government had to attract customers by offering a contract stipulating "reasonable rates." The contract is an agreement, voluntarily entered into by both

**32.** *Id.* at 1106; *National Ass'n of Broadcasters*, 554 F.2d at 1130 n.28.

**33.** *National Cable II*, 554 F.2d at 1106, 1108; *Electronic Indus. Ass'n*, 554 F.2d at 1114, 1115 n.13, 1116; *National Ass'n of Broadcasters*, 554 F.2d at 1129 n.28; *Capital Cities*, 554 F.2d at 1138.

**34.** *See Colorado-Ute Elec. Ass'n*, 533 F.Supp. at 202; *Public Serv. Co.*, 433 F.Supp. at 156.

**35.** *Mississippi Power & Light Co.*, 601 F.2d at 232, citing *National Ass'n of Broadcasters*, 554 F.2d at 1130 n.28.

**36.** *New England Power*, 415 U.S. at 349–50, 94 S.Ct. at 1154.

**37.** Circular No. A–25, ¶ 5(a).

**38.** *National Cable I*, 415 U.S. at 341–42, 94 S.Ct. at 1149.

parties, with its own terms and conditions.[39] Taxes, in contrast, are not entered into by contract—they are imposed by statute—and it is *taxes* that *National Cable I* forbids.

This point might be clarified by distinguishing between the activities of the Government acting as sovereign and those acting as landowner. The Supreme Court has used this distinction on occasion in other areas, though it is unclear how much the Court is willing to rely on it as the basis for decisions.[40] We use the distinction only to illustrate the factual difference between the present case and *National Cable I.*

**39.** *See* note 1 and accompanying text, *supra.*

**40.** The Supreme Court has recently developed the distinction between sovereign and ownership activities in cases involving the application of the Sherman Act to state and local government activities. The *Parker* doctrine states that the Sherman Act does not prohibit the situation where "[t]he state in adopting and enforcing the prorate program made no contract or agreement * * * but, *as sovereign, imposed* the restraint as an act of government." (Emphasis supplied.) *Parker v. Brown,* 317 U.S. 341, 352, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943) (California marketing program for raisins). In *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 791–92, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975), the Court, applying the *Parker* doctrine, found that a state bar association could be a governmental entity (therefore exempt) for some purposes and a commercial organization for others. The Court held that, in enforcing minimum fees for attorneys' services, the bar was engaging in a commercial activity subject to the Sherman Act. *Id.*

*City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), involved the application of *Parker* to a municipally owned electricity plant. The plurality opinion itself was quite narrow, but it was accompanied by opinions by Justices Brennan and Marshall and Chief Justice Burger, which emphasized the significance of the sovereign nature of an activity. Justice Brennan restated the "as sovereign" idea in *Parker, id.* at 409–10, 413, 98 S.Ct. at 1134–35, 1136, and Justice Marshall also emphasized the fact that a governmental activity is "imposed." *Id.* at 418, 98 S.Ct. at 1139. The Chief Justice advocated the sovereignty distinction at great length, *id.* at 418–26, 98 S.Ct. at 1139–43, stating that "the particular undertaking at issue here—the supplying of electric service—has not traditionally been the prerogative of the State." *Id.* at 424, 98 S.Ct. at 1142. This position has strong antecedents in the holding of *United States v. California,* 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 667 (1936), that a state-owned and -operated railroad was a common carrier subject to federal regulation, *id.* at 181, 183–84, 56 S.Ct. at 422, 423–24, though that Court also stated that "we think it unimportant to say whether the state conducts its railroad in its 'sovereign' or in its 'private' capacity." *Id.* at 183, 56 S.Ct. at 423.

Similar ideas were expressed in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), which was much cited in *City of Lafayette.* In *Usery,* the Court held that the states cannot be bound, constitutionally, to federal labor standards. The Court held that employment of people to do its work is one of a state's "integral operations in areas of traditional governmental functions," *id.* at 852, 96 S.Ct. at 2474, and that the Federal Government cannot regulate the "States *qua* States." *Id.* at 847, 96 S.Ct. at 2472. While apparently embracing the sovereign/ownership distinction conceptually ("traditional governmental functions")—and clearly reading *California* that way, *id.* at 854–55 & n.18, 96 S.Ct. at 2475 & n.18—the expansion of "integral governmental functions" to all state employment may blur the distinction in practice.

Justice Frankfurter criticized the distinction in his opinions for the Court in *New York v. United States,* 326 U.S. 572, 580–81, 66 S.Ct. 310, 313, 90 L.Ed. 326 (1946); *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 383–84, 68 S.Ct. 1, 2–3, 92 L.Ed. 10 (1947); and *Indian Towing Co. v. United States,* 350 U.S. 61, 65–68, 76 S.Ct. 122, 124–126, 100 L.Ed. 48 (1955), and he was echoed by Justice Stewart's dissent in *City of Lafayette,* 435 U.S. at 433–34, 98 S.Ct. at 1147. The two Justices raise basically two objections. The first is that the distinction is unclear and impracticable—a "quagmire." *Indian Towing,* 350 U.S. at 65, 76 S.Ct. at 124; *New York,* 326 U.S. at 580, 66 S.Ct. at 313. There is merit to this criticism, but in the present case the distinction between governmental and ownership activities is quite clear for illustrative purposes. The second objection is that all governmental activity is governmental simply by virtue of its being carried out by the Government: "Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity * * *." *Federal Crop Ins.,* 332 U.S. at 383–84, 68 S.Ct. at 2–3. Here, however, the Government has deliberately removed itself from direct regulatory action by interposing a contract between it and plaintiff, with its own rules to govern this transaction. While the distinction between sovereignty and ownership activities will not yield a clear line in all situations, its use by the Supreme Court in recent cases and its clarity in the particular case before us justify our use of the distinction to illustrate the essential differences between the present case and the licensing fee cases.

In *National Cable I*, the Government's power to allocate the airwaves and to issue licenses came not from its ownership of the airwaves but from its sovereign power to regulate certain activities—in the case of the FCC, interstate commerce. While it might be argued that the airwaves are in a sense a public resource capable of being owned, that is surely not the case with other examples of regulation to which the IOAA and *National Cable I* have been applied, like bank examinations and environmental impact statements. Certainly the Government's right to examine banks does not derive from its ownership of the bank's assets. Likewise, it would be somewhat bizarre to characterize the Government's interest in the whole environment as ownership of it.

In contract, the electricity provided by the Government to plaintiff is the product of Government-owned resources (land and water) and capital (the hydroelectric plant), both of which the Government has acquired and over which it exercises the rights of ownership. In selling the electricity pursuant to a contract, the Government is not performing a uniquely governmental function; it is selling a Government-owned resource. To give another example, if the Government rents out space in a building it owns, it does so by virtue of its ownership of the building, not by virtue of its status as sovereign. Renting office space can be done on the same basis and terms by any owner.

The distinction between sovereign acts and ownership acts ties in with the Supreme Court's language in *National Cable I*. Taxation is a sovereign activity; ownership does not confer such a power. To the extent that the Government limits its role to ownership, it is not taxing. The Government can only assess the electric rates at issue here by virtue of a contract with plaintiff, voluntarily entered. The Government cannot charge everyone in the hotel business for electricity; it can do so here because it owns Yosemite and has a contract with plaintiff. So long as the contract term—"reasonable rates"—is not violated, as we have held, the charges are within the Government's power.

*National Cable I* and *New England Power* involved no contract and thus do not apply to the present facts. A cost-based system is not required in the instant case. Under the contract, the agency does not run the risk of imposing an unauthorized tax, so the IOAA here need not be "read * * * narrowly to avoid constitutional problems." [41]

## C.

The Government takes the above distinction one step further and argues that the sale of electricity should be viewed as the sale of surplus property. If the sale of electricity is thus characterized, the Government contends, the Government is at liberty to charge whatever rate it can get.

This argument must be rejected for three reasons. The first is that the surplus property statute does not apply to this situation, nor does the Government argue that it does.[42] Circular No. A–25 explicitly excludes the sale of surplus property from its scope.[43] The second reason is that the analogy does not work; the situations to which the surplus property statute applies are significantly different from this one. In surplus property sales, the buyer has complete freedom to inspect each item and to bid on it. The buyer can take or leave any sale. Here, however, plaintiff has entered into a long-term contract and no longer has any choice but to accept the Government's electricity. That is precisely the reason for a contract term which requires that rates be reasonable. The third reason is the contract itself.

Under its "reasonable rates" term, the Government is obviously *not* at liberty to

---

**41.** *National Cable I*, 415 U.S. at 342, 94 S.Ct. at 1149.

**42.** 40 U.S.C. §§ 472, 484 (1976); 41 C.F.R. subpart 101–45.3 (1981).

**43.** Circular No. A–25, ¶ 2.

charge whatever it can get. We decline to adopt the surplus property analogy urged upon us by the Government.

■ We conclude that in the sale of electricity the rates charged are not limited to recovery of costs in the way that licensing fees are, but at the same time the rates are not completely unlimited like the sale of surplus property. The sale of electricity occupies a middle ground between licensing fees and surplus property. In a word, the electric rates must be *reasonable,* either in the sense of a cost basis or of a comparable rate. As this is the standard required by the contract, we restate our conclusion that the contract term and the IOAA impose the same standard.

### D.

Our purpose in Part III has been to determine whether judicial interpretation of the IOAA renders the lease or sale provision of Circular No. A–25 unlawful, which it must be if plaintiff's cost-based theory is correct. We find that the provision is not contrary to law. Circular No. A–25, whose fee provisions were expressly approved by the Supreme Court in *New England Power,*[44] anticipates the middle ground suggested above between fees and surplus property. At one end of the spectrum Circular No. A–25 excludes surplus property from its coverage (¶ 2), and at the other end it mandates a strict cost-based system for fees for special services (¶ 3(a)). The lease or sale of federal resources, however, is governed by the general reasonableness policy (¶ 3) but is not limited to the recovery of costs (¶ 3(b)).

The provision entitled "Lease or sale," quoted above,[45] mandates a well-defined and carefully limited method of comparative pricing. Circular No. A–25 requires that commercial practices be followed and fair market value be obtained, which are particularly appropriate where, as here, the NPS-supplied goods are ones which plaintiff would otherwise have had to acquire

from a commercial entity and the NPS activity is not uniquely governmental but is a commercial activity. We cannot agree that fair market value is an unreasonable price. Neither the IOAA nor the Supreme Court cases suggest that the Government should not be able to make profitable use of the resources it owns.

As we said above, the Yosemite system is well within the ambit of Circular No. A–25. It is a comparative-rate system, and its method of comparison is designed to ensure that the rates charged represent fair market value. The utility prices are easily accessible to all and the system is practicable, feasible, and requires no new accounting systems. We therefore conclude that the NPS rate system is within the power authorized by the IOAA.

### IV.

The burden of proof on plaintiff's motion for summary judgment is to show that the NPS system was illegal or unauthorized. So far we have analyzed the NPS system on its own merits and found it acceptable. But, more to the point, plaintiff has failed to make any real showing that the Yosemite system *fails* to pass muster. Even accepting plaintiff's argument—which we do not—that the cost-based system of *National Cable I* is required, plaintiff has presented no concrete evidence that NPS rates exceed the standard of "reasonable approximation" described in Part III–A above. Plaintiff's argument, while logically coherent as far as it goes, does not go beyond a mere sketch of the rate-setting system. Plaintiff considers some costs but does not consider others. It is unrealistic to limit cost considerations to energy costs—water *versus* petroleum *versus* uranium—where major capital and maintenance expenses are also involved.

There is no basis in the record for the claim that the cost to NPS of producing hydroelectric power is *in actual fact* less than the rate charged. Given the well-known principle of economies of scale, we

---

**44.** *New England Power,* 415 U.S. at 349–50, 94 S.Ct. at 1154.

**45.** *See* text at n.9, *supra.*

cannot assume that the NPS cost of generating hydroelectric power is the same as or less than that of the utility companies. The Government has suggested its plant's remoteness and the park's severe weather as cost-enhancing factors. The Government's costs may well be significantly higher, in which case the energy cost differential would make no difference in the final rate. With no facts in the record showing that the NPS costs are actually as low as plaintiff assumes them to be, we would not be justified in granting plaintiff's motion for summary judgment.

Plaintiff has also failed, in support of its motion, to present a coherent alternative to the present system. While espousing a cost-based system, plaintiff is apparently willing to accept certain anomalies—like the taxes which the utility companies must pay and NPS does not—in order to keep the system simple, in accordance with Circular No. A–25.[46] In other words, plaintiff suggests a modified comparative-rate system, in which only the energy cost adjustment clause (ECAC) is adjusted to reflect the proportion of hydroelectric power used at Yosemite.

The first problem with plaintiff's suggestion is the usual line-drawing one. While we are not overly concerned with the mere fact of line-drawing,[47] here it serves to point up the neither fish nor fowl aspect of plaintiff's suggestion. If cost is the ultimate consideration, it is hard to see why "phantom" (plaintiff's term) tax costs should be acceptable while "phantom" energy costs are not. If the true cost is known, there is no reason to approximate it so

crudely in the rates. Even accepting such an approximation, a decision that a certain point divides profit and windfall would be pure judicial fiat. It is far preferable to leave that function to executive agencies with appropriate expertise. One such agency, the Bureau of the Budget, has done so, and has reached a conclusion contrary to plaintiff's. We ought to respect that decision in this case.[48]

The second problem with plaintiff's suggestion is that it suffers from the superficiality noted above. As we said, the assumption that the simple excision of fossil and nuclear fuel costs from one part of the rate structure will result in a fairer system has no solid factual or theoretical foundation. There are complex cost issues in utility rate-setting which plaintiff does not begin to address. NPS, in adopting a comparative-rate system, chose to steer clear of those difficult accounting problems by using a fair market value standard and assuming that its costs were covered. If plaintiff is to upset that system, it must be replaced with a full cost accounting system which would be expensive for both plaintiff and the Government. Absent obvious, substantial unfairness in the simpler system, NPS was justified in avoiding the expense and potential for disputes of the more complex cost-based system.

Plaintiff's failure to meet its burden requires our denial of its motion for summary judgment. Defendant's cross-motion should be granted because we have found that the NPS rate system is in accordance with law and the contract. Defendant has also counterclaimed for *under* payment by

---

**46.** Circular No. A–25, ¶ 5(a).

**47.** *See Village of Belle Terre v. Boraas*, 416 U.S. 1, 8 & n.5, 94 S.Ct. 1536, 1540 & n.5, 39 L.Ed.2d 797 (1974).

**48.** We stated recently in *Acker v. United States*, 223 Ct.Cl. 281, 290, 620 F.2d 802, 806 (1980):

" * * * [T]he construction of a statute by an agency charged with its administration is given deference and entitled to great weight. *Udall v. Tallman*, 380 U.S. 1 [85 S.Ct. 792, 13 L.Ed.2d 616] (1965); *Bowles v. Seminole Rock Co.*, 325 U.S. 410 [65 S.Ct. 1215, 89 L.Ed. 1700] (1945);

*Crawford v. United States*, 179 Ct.Cl. 128, 142–43, 376 F.2d 266, 274 (1967), *cert. denied*, 389 U.S. 1041 [88 S.Ct. 781, 19 L.Ed.2d 831] (1968). Moreover, the passage of time increases the assumption that Congress is aware of the agency interpretation of a statute and concurs in it, since no subsequent legislation has altered it. *Benton v. United States*, 203 Ct.Cl. 263, 488 F.2d 1017 (1973); *Alabama v. United States*, 198 Ct.Cl. 683, 461 F.2d 1324, *cert. denied*, 409 U.S. 1023 [93 S.Ct. 464, 34 L.Ed.2d 315] (1972). * * *"

Both of these considerations apply to this case.

plaintiff, if the basis of the rates must be cost.[49] Our holding that the comparative-rate system here was reasonable precludes the counterclaim.

We therefore conclude, after careful consideration of the parties' submissions and after oral argument, that the NPS rate system at issue here was properly imposed. Plaintiff's motion for summary judgment is denied; defendant's cross-motion for summary judgment is granted; defendant's counterclaim is dismissed; and the petition is dismissed.

---

**49.** Obviously, the mere fact of a counterclaim does not provide a factual basis for denying plaintiff summary judgment, but it is one of the symptoms of the non-existence of a factual basis for plaintiff's motion.