Bruce E. ABBOTT, et al.,

v.

The UNITED STATES.

Nos. 94–651C, 95–475C, 96–92C.

United States Court of Federal Claims.

July 24, 1998.

Michael T. Leibig, Washington, DC, attorney of record for plaintiffs.

Domenique Kirchner, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Andrea Hagen, United States Secret Service, of counsel.

## OPINION

YOCK, Judge.

These consolidated civilian pay cases[1] are before the Court on the defendant's motion to dismiss one claim of certain plaintiffs on collateral estoppel grounds and on the parties' cross-motions for summary judgment on the plaintiffs' seven claims.[2] For the reasons stated below, the defendant's motion to dismiss one claim of 227 plaintiffs is granted, the plaintiffs' motion for summary judgment is granted with respect to liability as to one claim, and the defendant's cross-motion for summary judgment is granted with respect to six claims.

1. The three cases consolidated for purposes of this Opinion are *Abbott v. United States*, No. 94–651C; *Acosta v. United States*, No. 95–475C; and *Adams v. United States*, No. 96–92C.

2. The Complaints originally asserted nine claims. The plaintiffs have withdrawn two of these claims. *See infra* notes 6 and 7.

### Factual Background

The plaintiffs are 557 current and former members of the Uniformed Division of the United States Secret Service ("UD").[3] The UD consists of a Headquarters Staff and three branches: the White House Branch, the Foreign Missions Branch, and the Program Support Branch. Members of the UD are federal law enforcement officers assigned to protect the President and Vice President and their immediate families; the White House and its grounds; the Treasury Building and its grounds; the official residence of the Vice President and its grounds; and foreign diplomatic missions in the United States, its territories, and possessions. 3 U.S.C. § 202 (1994).

UD members are generally scheduled to work an eight-hour basic workday, five times each week. In addition to the basic workday, UD members are required to report for roll-call activities. Roll-call time is scheduled for one-half hour each workday and is used for the reading of rolls and other preparation for the daily tour of duty. By law, roll-call time is uncompensated. Over the course of a two-week pay period, a UD member who works full time, but does not work any overtime, will be scheduled to be on duty for 85 hours, five of those hours being uncompensated roll-call time.

Members of the UD also work overtime. UD members sign up in their assigned unit's overtime book to indicate their availability to work specific tours of duty which they are not normally scheduled to work. UD members can place their names in the appropriate overtime book from two to sixteen days prior to the date that the overtime is actually worked. In order to fill vacancies arising from scheduled members reporting sick or from other circumstances yielding a manning shortage for a particular tour of duty, a unit's scheduling officer consults the applicable

3. Originally, 605 plaintiffs were listed in the Complaints in these cases. By Orders dated March 11, 1996, and March 10, 1997, 48 plaintiffs were dismissed from these cases, with prejudice, pursuant to Rules 41(b) and 37 of the Rules of the United States Court of Federal Claims ("RCFC"). Those 48 former plaintiffs are listed in Appendix C of this Opinion.

overtime book to determine if volunteers are available to work. If there are not enough volunteers to fill the vacancies, the UD may cancel a member's day off to fill a position.

Under the basic pay authority governing the UD, the Code of the District of Columbia ("D.C.Code"),[4] overtime work is compensated at one and one-half times the UD member's basic hourly rate.[5] The D.C.Code places a *cap* on the maximum total compensation that a member of the UD may receive during each pay period. Under the Fair Labor Standards Act ("FLSA"), which also is applicable to the plaintiffs, overtime must be compensated at a rate of one and one-half times the regular rate at which a UD member is employed. The FLSA does not place a cap on the maximum total compensation that a UD member may receive each pay period. For each pay period, the UD calculates each member's overtime entitlement under both the D.C.Code and the FLSA. The member is entitled to overtime pay under whichever authority provides the greater entitlement.

In addition to overtime pay, the D.C.Code authorizes payment of a longevity premium to some UD members. UD members are entitled to longevity pay once they meet length of service requirements specified in the D.C.Code.

The United States Code also authorizes payment of additional premium pay to UD members. A UD member who is regularly scheduled to work between 6:00 p.m. and 6:00 a.m. is entitled to a "night differential" amounting to 10 percent of the UD member's rate of basic pay. In addition, a UD member who performs work during a regularly scheduled, nonovertime shift, a part of which falls on a Sunday, is entitled to Sunday premium pay amounting to 25 percent of the UD member's rate of basic pay.

In their Complaints filed in this Court, the plaintiffs alleged that the UD improperly calculated their pay in violation of several laws. The plaintiffs subsequently filed the instant Motion for Summary Judgment, seeking summary disposition of every claim raised in the Complaints. The plaintiffs assert that the defendant unlawfully: (1) diminishes overtime pay when the members take approved leave (the "*Lanehart* overtime claim"); (2) diminishes "roll-call pay" when the members take approved leave (the "roll-call claim"); (3) diminishes the members' pay when their compensation exceeds the pay cap set by the D.C.Code (the "salary cap claim"); (4) failed to include longevity pay when calculating the members' "regular rate of pay" for overtime purposes during the period of August 8, 1993, through October 27, 1996 (the "longevity pay claim"); (5) refuses to include night differential pay when calculating the members' "regular rate of pay" for overtime purposes (the "night differential claim"); (6) refused to pay the Sunday premium to plaintiffs who reported for roll-call at 11:30 p.m. on Sundays during the period of February 23, 1992, through October 13, 1995 (the "Sunday night premium pay claim"); (7) refused to pay the Sunday premium to certain plaintiffs who took approved leave rather than report for roll-call at 11:30 p.m. on Sundays during the period of February 23, 1992, through October 13, 1995 (the "Sunday night *Armitage* claim"); (8) refuses to include the overtime premium in calculating the night differential for the members who work overtime at night (the "night overtime claim")[6]; and (9) failed to pay overtime compensation to some plaintiffs holding the rank of sergeant, despite a previous judgment that held that such plaintiffs were entitled to overtime (the "sergeants' overtime claim.").[7]

The defendant has conceded liability as to claim (4) above and has cross-moved for summary judgment on the remainder of the plaintiffs' claims. In addition, the defendant has moved to dismiss claim (1) above with

---

**4.** The D.C.Code was enacted by the United States Congress. Congress authorized compensation for overtime work by members of the UD in 1965. Pub.L. No. 89–282, 79 Stat. 1013.

**5.** In some situations, UD members receive compensatory time off in lieu of monetary compensation for overtime hours worked.

**6.** The plaintiffs withdrew this claim during oral arguments. (Tr. at 117.)

**7.** The plaintiffs have withdrawn this claim. (*See* Pls.' Resp. to Def.'s Mot. to Dismiss and Cross–Mot. for Summ. J. and in Reply to Def.'s Opp'n to Pls.' Mot. for Summ. J. at 3 n. 5.)

respect to 227 plaintiffs. The defendant contends that 227 plaintiffs have previously litigated this issue and thus are collaterally estopped from relitigating the overtime issue before this Court. Oral arguments with respect to the motions were heard on April 8, 1998.

### Discussion

### I. *Applicable Law*

#### A. *UD Pay Provisions*

The basic pay authority for UD members is the D.C.Code.[8] The schedule of salaries used by the Metropolitan Police Department, and thus also by the UD, is published at section 4–406 of the D.C.Code. A UD member's "basic workweek" is defined as "a 40–hour workweek, excluding roll-call time." D.C.CODE ANN. § 4–1104(a)(3) (1994). The basic workweek must be scheduled over five days. *Id.* § 4–1104(b). The "basic workday" is defined as "an 8–hour day excluding roll-call time." *Id.* § 4–1104(a)(4). "Roll-call time" is "that time, not exceeding one-half hour each workday, which is in addition to each basic workday of the basic workweek for reading of rolls and other preparation for the daily tour of duty." *Id.* § 4–1104(a)(6). "[R]oll-call time shall be without compensation or credit to the time of the basic workweek." *Id.* § 4–1104(b).

The D.C.Code also outlines the eligibility of UD members for overtime pay. "Overtime work" is defined as "[a]ll officially ordered or approved hours of work (except roll-call time) performed by officers and members in excess of the basic workweek in any administrative workweek."[9] *Id.* § 4–1104(c). UD members below the rank of lieutenant (all plaintiffs fit this category) usually receive compensation for overtime work "by payment at one and one-half times the basic hourly rate of such officer or member and all such compensation shall be considered premium pay." *Id.* § 4–1104(d)(1)(A).

In four situations, a member of the UD will receive compensatory time off rather than monetary payment for overtime work performed: (1) a first court appearance; (2) a continuation of a regular tour of duty; (3) call back to duty that is not an immediate continuation of a regular tour of duty; and (4) when the member requests compensatory time off in lieu of monetary compensation for overtime work performed. *Id.* §§ 4–1104(d), (e), (f), (g). Overtime work compensated in this manner "shall be compensated * * * at a rate of 1 hour of compensatory time for each hour of overtime work performed." *Id.* § 4–1104(f)(1).

The plaintiff UD members are nonexempt, *i.e.,* covered, under the provisions of the FLSA. United States Secret Service Directives System, Administrative Manual ("Admin. Manual") § PER–10(8) (Sep. 1, 1989). The FLSA sets a floor for overtime compensation that employers must pay to nonexempt employees. *Alexander v. United States,* 32 F.3d 1571, 1576–77 (Fed.Cir.1994). The basic FLSA overtime provision provides that:

> Except as otherwise provided in this section, no employer shall employ any of his employees * * * for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1) (1994). A "tour of duty" provision applicable to law enforcement officers modifies the above provision so that, rather than qualifying for overtime based on a 40–hour workweek, UD members are paid compensation of one and one-half times the regular rate at which they are employed for all hours worked in excess of 85.5 hours in a basic work period of 14 days. *Id.* § 207(k); 29 C.F.R. § 553.230(b) (1997). For purposes of calculating the FLSA overtime entitlement, "the 'regular rate' at which

8. "A member of the United States Secret Service Uniformed Division shall receive a salary at the rate provided for the corresponding grade in the Metropolitan Police force (including longevity increases provided by section 401 of the District of Columbia Police and Firemen's Salary Act of 1958) * * *." 3 U.S.C. § 204(b) (1994).

9. An "administrative workweek" is "a period of 7 consecutive calendar days." D.C.CODE ANN. § 4–1104(a)(2).

an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee," with the exception of seven enumerated types of compensation which are inapplicable to the instant consolidated cases. 29 U.S.C. § 207(e).

In determining whether or not a UD member has reached the 85.5–hour threshold for FLSA overtime purposes, roll-call time is considered "hours worked." Roll-call time must be credited as hours worked because it is "time spent by an employee performing an activity for the benefit of an agency and under the control or direction of the agency." 5 C.F.R. § 551.401(a) (1997). More specifically, roll-call time must be credited as hours of work because it is a "preparatory activity":

> If an agency reasonably determines that a preparatory or concluding activity is closely related to an employee's principal activities, and is indispensable to the performance of the principal activities, and that the total time spent in that activity is more than 10 minutes per workday, the agency shall credit all of the time spent in that activity, including the 10 minutes, as hours of work.

*Id.* § 551.412(a)(1).

Although roll-call time must be credited as hours of work under the FLSA, it need not be considered hours of work under any other pay authority, including the D.C.Code:

> Time that is considered hours of work under this part shall be used only to determine an employee's entitlement to minimum wages or overtime pay under the [Fair Labor Standards] Act, and shall not be used to determine hours of work for pay administration under title 5, United States Code, or any other authority.

*Id.* § 551.401(d). Consequently, even though UD members are not monetarily compensated for five hours of roll-call time during their regularly scheduled two-week pay period, they do receive five hours of credit for that roll-call time to help them reach the 85.5–hour FLSA overtime threshold.

In addition to the pay entitlements provided by the D.C.Code and the FLSA, UD members are also eligible for premium pay under title 5 of the United States Code. 5 U.S.C. § 5541(2)(C)(iv)(II) (1994). "[A]n employee is entitled to pay for nightwork at his rate of basic pay plus premium pay amounting to 10 percent of that basic rate." *Id.* § 5545(a). Nightwork is defined as "regularly scheduled work between the hours of 6:00 p.m. and 6:00 a.m." *Id.* The ten percent premium pay provided by this section is commonly referred to as "night differential" pay. Additionally, UD members are eligible for "Sunday pay":

> An employee who performs work during a regularly scheduled 8–hour period of service which is not overtime work as defined by section 5542(a) of this title a part of which is performed on Sunday is entitled to pay for the entire period of service at the rate of his basic pay, plus premium pay at a rate equal to 25 percent of his rate of basic pay.

*Id.* § 5546(a).

In summary, the instant consolidated cases involve the interpretation and interaction of several statutory provisions codified in titles 5 and 29 of the United States Code and title 4 of the D.C.Code. In addition, these cases require the application of the law of the two prior decisions discussed below.

### B. *The Lanehart Decision*

*Lanehart v. Horner,* 818 F.2d 1574 (Fed. Cir.1987), involved a challenge by federal firefighters to an overtime policy promulgated by the Office of Personnel Management ("OPM"). The plaintiff firefighters "normally and regularly work[ed] six twenty-four hour shifts in a biweekly pay period." *Lanehart,* 818 F.2d at 1575. Thus, the plaintiffs worked a regularly scheduled tour of 144 hours in a two-week pay period. The FLSA overtime threshold determined to be applicable to federal firefighters, through application of the FLSA "tour of duty" provision, was 106 hours over a two-week pay period. *See id.* at 1576; 29 U.S.C. § 207(k) (1982). Consequently:

> [F]ederal firefighters, who work a regularly scheduled tour of duty of 144 hours in the two-week pay period, are entitled to receive compensation in the form of: (1)

the pro rata part of their annual basic pay and annual premium pay under Title 5; and (2) overtime pay under FLSA for thirty-eight hours.

*Lanehart,* 818 F.2d at 1576.

Under the overtime policy promulgated by the OPM, "[o]nly those hours that the employee is actually on duty during the tour of duty shall be included in hours worked under the FLSA." *Id.* If a firefighter took authorized "leave with pay," the hours of leave taken would be subtracted from the 38 hours of FLSA overtime that was regularly scheduled as part of the employee's tour of duty. Thus, "[o]nce the authorized absence equals or exceeds thirty-eight hours the employee receives no FLSA overtime compensation." *Id.* at 1576 n. 8.

The firefighters brought suit in federal district court, asserting that the OPM overtime policy violated federal "leave with pay" statutes.[10] The district court granted the Government's motion for summary judgment, "[c]oncluding that an employee may not be compensated for overtime work when the employee does not actually work overtime hours." *Id.* at 1577.

On appeal, however, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") determined that the OPM policy did violate the title 5 "leave with pay" statutes. The court concluded "that 'pay' as used in the 'leave with pay' statutes has consistently been construed for more than a century as encompassing the total compensation or remuneration normally and regularly received by an employee." *Id.* at 1581. Reversing the district court, the Federal Circuit held "that the 'leave with pay' statutes in their purpose and effect prevent any reduction in the customary and regular pay of the appellants, including overtime pay under Title 29 to which they would be entitled, when appellants are on authorized leave under [the 'leave with pay' statutes]." *Id.* at 1583. The court also noted:

> We do not consider overtime pay under Title 29 for overtime work that is not on a regularly recurring basis and within the normal scheduled work period to be part of customary and regular pay for this purpose. Thus, Title 29 overtime pay for irregularly or intermittently performed overtime whether administratively scheduled or unscheduled would not be covered.

*Id.* at 1583 n. 17.

### C. *The Armitage Decision*

*Armitage v. United States,* 23 Cl.Ct. 483 (1991), *aff'd,* 991 F.2d 746 (Fed.Cir.1993), involved claims by security officers at various federal facilities based on the holding of *Lanehart.* The plaintiffs alleged that they were regularly scheduled to work overtime during every shift and that they were not compensated for this regularly scheduled overtime when they took authorized leave with pay during their basic eight-hour workday. The plaintiffs further alleged a *Lanehart* violation in their federal employer's policy of refusing to pay Sunday premium pay to employees who took authorized leave with pay on a regularly scheduled Sunday workday.

As to the Sunday premium pay claim, the court held that the plaintiffs were entitled to Sunday premium pay if they were regularly scheduled to work on Sunday, took authorized leave with pay on Sunday, and were charged leave by the employer for the hours not worked on Sunday. The Federal Circuit affirmed this holding on appeal. *Armitage v. United States,* 991 F.2d 746 (Fed.Cir.1993).

The overtime issue, however, was resolved adversely to the plaintiffs. The Court observed that, when the plaintiffs elected not to work overtime hours that presumably were "regularly scheduled," the employer did not charge the plaintiffs leave for the overtime that was not worked. The Court concluded that "the leave with pay statutes do not apply unless the agencies actually treated plaintiffs as on annual or sick leave during the regularly scheduled overtime * * * to which they claim entitlement." *Armitage,* 23 Cl.Ct. at 488. Because the agency defendants did not treat the plaintiffs as being on leave, *i.e.,* did

---

**10.** The federal "leave with pay" statutes are codified at 5 U.S.C. §§ 6303, 6307, 6322, 6323

(1994).

not charge leave for the overtime hours during which the plaintiffs were absent, the "leave with pay" statutes did not entitle the plaintiffs to pay for the overtime hours not worked.

The Court illuminated its decision by comparing the plaintiffs to the firefighter plaintiffs in *Lanehart:*

> It is important to note that the firefighters in *Lanehart* earned and used leave at an accelerated rate because of their uncommon tour of duty. * * * Moreover, they were required to take leave for any hours of absence during their regular tour of duty, including those hours for which they received FLSA overtime. * * * Thus, when the firefighters took a day of leave, their leave accounts were charged 24 hours of leave; when they took leave for an entire pay period, they were charged 144 hours of leave.
>
> * * * *
>
> Unlike firefighters, the plaintiffs in this case were not placed in a leave status and their leave account was not charged when they were excused from working regularly scheduled overtime on days which they took eight hours of annual or sick leave. Their attendance was excused, and they simply did not work. Their nonappearance for overtime was authorized and they were not paid for those overtime hours that they did not work. For these employees, unlike the firefighters in *Lanehart,* the leave with pay statutes do not come to bear, unless plaintiffs can demonstrate that they should be treated as actually on leave. In the absence of such a showing, the precise holding of *Lanehart* does not assist plaintiffs with respect to regularly scheduled overtime. *Lanehart* held only that an employee is entitled not to have his pay reduced when "on authorized leave under [5 U.S.C.] sections 6303, 6307, 6322, and 6323." 818 F.2d at 1583.

*Id.* at 487, 488–89. Because the plaintiffs were not charged leave for overtime hours not worked, the Court held that neither the leave with pay statutes nor the overtime pay statutes entitled the plaintiffs to pay for overtime hours not worked. *Id.* at 492. The plaintiffs did not appeal this adverse decision.

## D. *Summary Judgment Standard*

Summary judgment is properly granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims ("RCFC"), Rule 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of proving that there are no genuine issues of material fact. *Celotex Corp.,* 477 U.S. at 317, 106 S.Ct. 2548. This burden "may be discharged by 'showing'— that is, pointing out to the [Court]—that *there is an absence of evidence to support the non-moving party's case." Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). If there is any doubt as to factual issues, they must be resolved in favor of the nonmoving party, and all presumptions and inferences should be drawn in favor of the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In challenging a motion for summary judgment, the nonmovant may not merely rest upon the complaint but must point to probative evidence tending to support its version of the disputed material facts. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. "If the evidence [presented by the nonmovant] is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted). Furthermore, if disposition of a case hinges on a question of statutory interpretation, summary judgment may be granted because statutory interpretation is a question of law. *See Nissho Iwai Am. Corp. v. United States,* 143 F.3d 1470, 1472–73 (Fed.Cir.1998); *City of Tacoma, Dep't of Pub. Utils. v. United States,* 28 Fed.Cl. 637, 642 (1993).

## II. *The Plaintiffs' Claims*

After briefing and oral arguments, seven claims remain the subject of the instant cross-motions for summary judgment. In

addition, the defendant's partial defense of collateral estoppel remains to be addressed with respect to one of the plaintiffs' claims.[11]

### A. The Lanehart Overtime Claim

The plaintiffs in the instant cases contend that they, like the *Lanehart* plaintiffs, work "regularly scheduled" overtime, the compensation for which should be considered "customary and regular pay" which cannot be diminished when the plaintiffs take authorized leave with pay. The defendant disputes this claim on three grounds. First, the Government asserts that 227 of the plaintiffs in the instant cases are barred from asserting the *Lanehart*-styled overtime claim, because those 227 plaintiffs have already litigated that issue in the consolidated cases styled as *Amshey v. United States*, 26 Cl.Ct. 582 (1992), *vacated*, 35 Fed.Cl. 358 (1993). Second, the defendant contends that none of the plaintiffs fit into the *Lanehart* situation because overtime worked by the plaintiffs is not "regularly scheduled" and thus compensation for overtime is not "customary and regular" pay. Finally, the Government asserts that the plaintiffs are not charged leave for overtime not worked and thus the plaintiffs' claim fails under the rationale of *Armitage*. The Court will address each of the defendant's challenges in turn.

#### 1. Amshey and Collateral Estoppel

A total of 227 of the plaintiffs in the instant consolidated cases were also plaintiffs in *Amshey*. In that case, the parties cross-moved for summary judgment on the issue of whether or not the plaintiffs worked regularly scheduled overtime within the meaning of *Lanehart*. In granting the Government's motion for summary judgment, Senior Judge Harkins held, in an Order dated August 29, 1990:

> Plaintiffs do not work regularly scheduled overtime, and *Lanehart* does not consider

overtime pay under Title 29 for overtime work that is not on a regularly recurring basis and within the normal scheduled work period.

Unlike the firefighters in *Lanehart*, plaintiffs' assigned tours of duty do not include any hours of overtime that would qualify as regularly scheduled. Plaintiffs' overtime is not shown to be part of customary and regular pay, and plaintiffs are not entitled to overtime under *Lanehart*.

The remaining issues in the case subsequently went to trial, and an opinion on liability was issued in that case on June 30, 1992. On May 6, 1993, the parties filed a Joint Stipulation for Entry of Final Judgment. The stipulation was conditioned upon the Court entering an order vacating its entire June 30, 1992 opinion. On May 7, 1993, the Court issued an order vacating its June 30, 1992 opinion and directing the clerk to enter final judgment pursuant to the terms of the stipulation. *Amshey v. United States*, 35 Fed.Cl. 358 (1993). The pertinent provisions of the Joint Stipulation for Entry of Final Judgment provided:

> On or about August 29, 1990, the court granted defendant's motion for partial summary judgment finding that the overtime worked by plaintiffs was not regularly scheduled and rejecting plaintiffs' argument that the Uniformed Division had failed to properly credit them with periods of paid absence (annual leave, holidays, etc.) in calculating their overtime.

> The parties now resolve any and all remaining claims in these consolidated cases and agree as follows:

> \* \* \* \*

> 3. Accordingly, without their constituting an admission of liability upon the part of either plaintiffs or defendant, the parties stipulate that judgment be entered in the

---

11. Citing the stipulated judgment that resolved *Amshey v. United States*, 26 Cl.Ct. 582 (1992), *vacated*, 35 Fed.Cl. 358 (1993), the defendant has asserted that the doctrine of *res judicata* bars certain plaintiffs in these cases from asserting claims for overtime pay arising prior to May 2, 1993. The plaintiffs agree that the stipulated judgment bars the overtime claims of those plaintiffs who were also plaintiffs in *Amshey* for periods prior to May 2, 1993. Overtime claims by

such plaintiffs, then, are limited to periods after May 1, 1993. The defendant also has asserted laches as a defense to overtime claims by plaintiffs who were not parties to the *Amshey* case. Because many plaintiffs in the instant consolidated cases were not employed by the UD at the time of the *Amshey* judgment, and because laches is generally disfavored in overtime pay cases, *Manning v. United States*, 10 Cl.Ct. 651, 656 (1986), the Court finds that defense unavailing.

amount of $1,300,000.00 in favor of all named plaintiffs as a group. * * *

* * * *

5. For the period up to and including May 1, 1993, plaintiffs release, waive, and abandon all claims against the United States, or its officers, agents or employees, that are set forth in count 1 and 3 of the complaints in nos 583–86C, 703–86C, 296–87C and 197–88C, and in count 1 of the complaint in 196–88C, including any claim for interest, or liquidated damages.

6. Any claims that plaintiffs may have for pay for work performed on or after May 2, 1993 are excluded from this agreement.

7. The parties waive and abandon all rights of appeal in this lawsuit, including any right to appeal from the Court's entry of partial summary judgment in favor of defendant on or about August 29, 1990.

* * * *

10. This stipulation is conditioned upon the Court's entering an order vacating its entire opinion issued on June 30, 1992.

11. This stipulation is made solely for the purpose of enabling the Court to enter the judgment referred to in paragraph 3 above, if the Court vacates its entire opinion issued on June 30, 1992.

The defendant contends that the final, stipulated judgment entered in *Amshey* precludes the plaintiffs in that case from arguing the *Lanehart* regularly scheduled overtime issue again before this Court. The plaintiffs retort that they are permitted to reargue this issue because the judgment in *Amshey* does not control any claims for pay after May 1, 1993.

█ The doctrine of collateral estoppel, or issue preclusion, "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). "The principle of collateral estoppel dictates that an issue that is fully and fairly litigated, is determined by a final judgment, and is essential to that judgment, is conclusive in a subsequent action between the same parties." *Bingaman v. Department of the Treasury,* 127 F.3d 1431, 1436–37 (Fed.Cir. 1997).

In *Amshey,* the Court ruled, after full and fair litigation of the issue, that the "plaintiffs' assigned tours of duty do not include any hours of overtime that would qualify as regularly scheduled. Plaintiffs' overtime is not shown to be part of customary and regular pay, and plaintiffs are not entitled to overtime under *Lanehart.*" Order of Aug. 29, 1990, at 3. The determination that the plaintiffs' overtime was not regularly scheduled and thus not part of customary and regular pay was essential to the Court's grant of summary judgment in favor of the Government on the *Lanehart* overtime issue. Indeed, the determination completely resolved Count 2 of the *Amshey* plaintiffs' complaint.

█ The Court eventually issued an opinion on liability on the remaining claims in *Amshey.* That opinion was vacated and replaced by a stipulated judgment. However, the fact "that a judgment is entered by stipulation does not *in and of itself* remove the effect of a court's prior determination of specific issues in the litigation." *Hartley v. Mentor Corp.,* 869 F.2d 1469, 1472 (Fed.Cir. 1989). Rather, the stipulated judgment "must be construed to determine its effect in light of all of the circumstances." *Id.*

Nothing in the stipulated judgment in *Amshey* conflicts with the earlier regularly scheduled overtime ruling by Judge Harkins. The stipulated judgment itself, while vacating the opinion on liability with respect to two issues, does not profess to vacate the prior summary judgment ruling on the *Lanehart* overtime issue. To the contrary, the stipulated judgment expressly recognizes that "[o]n or about August 29, 1990, the Court granted defendant's motion for partial summary judgment finding that the overtime worked by plaintiffs was not regularly scheduled," and provides that "[t]he parties waive and abandon all rights of appeal in this lawsuit, including any right to appeal from the Court's entry of partial summary judgment in favor of defendant on or about August 29, 1990."

■ It is clear from the plain language of the stipulated judgment that the parties manifested an intention to be bound by Judge Harkins' ruling that the "plaintiffs' assigned tours of duty do not include any hours of overtime that would qualify as regularly scheduled. Plaintiffs' overtime is not shown to be part of customary and regular pay, and plaintiffs are not entitled to overtime under *Lanehart*." *Amshey* Order of Aug. 29, 1990, at 3. If a stipulated judgment, "by its terms, indicates that the parties thereto intend to preclude any challenge to [an issue decided by summary judgment during the course of litigation], even in subsequent litigation involving a new cause of action, then that issue can be precluded." *Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 480–81 (Fed.Cir.1991); *see also Hartley v. Mentor Corp.*, 869 F.2d 1469 (Fed.Cir.1989) (holding that issue decided on summary judgment had preclusive effect in subsequent litigation, where stipulated judgment did not conflict with or vacate the summary judgment ruling and where parties voluntarily relinquished the right to appeal the summary judgment ruling).

■ A total of 227 of the plaintiffs in the instant consolidated cases were also plaintiffs in *Amshey*. Those plaintiffs agreed, through the stipulated judgment in *Amshey*, to be bound by the summary judgment ruling that they "do not work regularly scheduled overtime" and that their overtime is not part of "customary and regular pay." Yet those 227 plaintiffs have now brought the same issue before this Court. It is this precise vice, the endless relitigation of the same issue by the same parties, that the doctrine of collateral estoppel is designed to prevent.

The 227 plaintiffs in question argue that the stipulated judgment limits the *Amshey* summary judgment ruling to claims arising prior to May 2, 1993. The plain language of the stipulated judgment, however, undercuts the plaintiffs' argument. The preamble of the stipulated judgment recognizes that "[o]n or about August 29, 1990, the court granted defendant's motion for partial summary judgment finding that the overtime worked by plaintiffs was not regularly scheduled." The

preamble then recites that the terms of the stipulated judgment are intended to "resolve any and all *remaining* claims in these consolidated cases." (Emphasis added.) The agreement expressly pertains only to claims that remained after the Court granted the defendant's motion for partial summary judgment on the *Lanehart* overtime issue. Thus, the May 2, 1993 date recited in paragraph 6 of the agreement pertains only to claims that remained after the *Lanehart* overtime issue had been resolved by summary judgment. To adopt the plaintiffs' view that the stipulated agreement allows for relitigation of the regularly scheduled overtime issue would be to adopt an interpretation that renders meaningless the agreement's preamble. This Court must reject such an unreasonable construction. *See W.M. Schlosser Co. v. United States*, 767 F.2d 870, 874 (Fed.Cir. 1985) (deeming unreasonable an interpretation that would render contract language superfluous); *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983) (reciting the maxim that "an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless.").

The summary judgment ruling was not vacated, altered, or date-restricted by the stipulated judgment. Consequently, the 227 plaintiffs in the instant cases, who also were plaintiffs in *Amshey*, are collaterally estopped from arguing the *Lanehart* regularly scheduled overtime issue before this Court. The defendant's motion to dismiss this claim by the 227 former *Amshey* plaintiffs is granted.[12]

### 2. *Regularly Scheduled Overtime*

■ Even if issue preclusion did not apply in the instant cases, however, the 227 plaintiffs addressed above, like the other 330 plaintiffs, would not succeed on the regularly scheduled overtime issue. For the reasons stated below, this Court, consistent with the Court in *Amshey*, concludes that the plaintiffs do not work regularly scheduled overtime that yields "customary and regular" pay under *Lanehart*.

---

**12.** The 227 collaterally-estopped plaintiffs are listed in Appendix A of this Opinion.

*Lanehart* addressed the unique work schedule of federal firefighters. Firefighters "work a regularly scheduled tour of duty of 144 hours in the two-week pay period." *Lanehart*, 818 F.2d at 1576. The FLSA overtime threshold applicable to federal firefighters was 106 hours in a two-week pay period. Thus, 38 FLSA overtime hours were built into the firefighters' regularly scheduled tour of duty. Accordingly, 38 hours of overtime pay were built into the customary and regular pay that a firefighter would receive for working a regularly scheduled 144–hour tour of duty. The Federal Circuit held that this built-in, customary and regular 38 hours of overtime pay that a firefighter received for working his regularly scheduled tour of duty could not be diminished when a firefighter took authorized leave; to do so would violate the title 5 "leave with pay" statutes.

The tours of duty of UD members are much different than those of the firefighters in *Lanehart*. For FLSA purposes, UD members work regularly scheduled tours of duty amounting to 85 hours in a two-week pay period. The FLSA threshold applicable to UD members is 85.5 hours in a two-week pay period. Thus, no FLSA overtime hours are built into a UD member's regularly scheduled tours of duty. Accordingly, no FLSA overtime pay is included in the regular and customary pay that a UD member receives for working a tour of duty. Because there is no overtime pay to be diminished, the UD does not violate the title 5 "leave with pay" statutes by not paying UD members overtime pay when they take authorized leave over the course of their regularly scheduled tours of duty.

The plaintiffs, however, assert a theory that may best be described as "constructive" regularly scheduled overtime. They contend that most UD members work some amount of overtime during each two-week pay period and that the UD could regularly schedule this overtime if it so desired. The plaintiffs assert that the UD violates the "leave with pay" statutes by not paying overtime compensation for overtime hours that the plaintiffs theoretically might have worked had they not taken leave.

This Court declines to extend *Lanehart* to cover the constructive overtime theory advanced by the plaintiffs. The overtime worked by the plaintiffs is not "regularly scheduled" in the sense that term was used in *Lanehart*. The firefighters' regularly scheduled tours of duty regularly incorporated 38 hours of overtime. The instant plaintiffs' regularly scheduled tours of duty incorporate no hours of overtime. While the pay records introduced by the plaintiffs tend to support their contention that, in addition to their regularly scheduled 85–hour tours of duty, each plaintiff works some overtime during most pay periods, the records fail to show any regularity in the amount of overtime worked by each plaintiff. Over the course of a year, each plaintiff works several administrative workweeks without putting in any overtime hours. During the remaining weeks of the year, each plaintiff works a variable amount of overtime that defies any guise of regularity.[13] The overtime worked by each plaintiff is irregularly performed, not regularly recurring, and thus outside the scope of the *Lanehart* holding. *See Lanehart*, 818 F.2d at 1583 n. 17.

Moreover, unlike the *Lanehart* firefighters, the plaintiffs in the instant cases are not regularly required to work any amount of overtime. Rather, as the plaintiffs make clear in their Motion for Summary Judgment and the declarations in support thereof, overtime is worked by those UD members who

**13.** The time cards submitted by the plaintiffs in support of their Motion for Summary Judgment reveal the extent of the irregularity of overtime worked by the plaintiffs. The following numbers represent the hours of overtime worked each week by five representative plaintiffs over the first 10 weeks of 1995. Plaintiff Gary Niedzwiecki: week of 1/1—0; 1/8—7.4; 1/15—28.2; 1/22—15.4; 1/29—7.4; 2/5—23.4; 2/12—1; 2/19—9.4; 2/26—0; 3/5—0. Plaintiff Steven Smith: week of 1/1—15; 1/8—0; 1/15—0; 1/22—0; 1/29—11.2; 2/5—14.2; 2/12—0; 2/19—31.2; 2/26—0; 3/5—0. Plaintiff Richard Cook: week of 1/1—0; 1/8—0; 1/15—7.4; 1/22—0; 1/29—0; 2/5—0; 2/12—18.4; 2/19—10.2; 2/26—16; 3/5—7.4. Plaintiff Robert Franz: week of 1/1—32.2; 1/8—4; 1/15—23.4; 1/22—0; 1/29—0; 2/5—0; 2/12—0; 2/19—0; 2/26—12; 3/5—24. Plaintiff Bruce Abbott: week of 1/1—0; 1/8—4; 1/15—8; 1/22—4; 1/29—4; 2/5—0; 2/12—4; 2/19—0; 2/26—4; 3/5—4.

volunteer to work extra hours. (*See* Decl. of Richard Cook at ¶ 17 ("Uniformed Division Officers signing up in the overtime book state their availability to work, on a particular day, or during a specific tour of duty which they are not normally scheduled to work."); Mem. in Support of Pls.' Mot. for Summ. J. at 28 ("The available overtime sign-up books contain the names of officers ready and willing to perform the overtime."). *See also* Decl. of [former UD Chief] Clark Benson at ¶ 7 ("Currently, more members of the Uniformed Division volunteer for overtime than there are vacancies to fill.").) *Cf. Aviles v. United States*, 151 Ct.Cl. 1, 8, 1960 WL 8530 (1960) (in this pre-*Lanehart* case, the plaintiffs' overtime was deemed regularly scheduled where "[t]he plaintiffs had no choice but to work the overtime."). The fact that a UD member has the opportunity to volunteer for large quantities of overtime does not translate into a *Lanehart* entitlement to overtime pay when that member chooses not to volunteer for overtime.

The plaintiffs also allege that the UD could practically and efficiently schedule overtime in advance if it so desired, and thus their overtime should be deemed "regularly scheduled." The plaintiffs ground this argument in the language of *Buchan v. United States*, 33 Fed.Cl. 513 (1995), which states that "[i]f the [agency] could have scheduled the overtime because the work was habitual and routine, but failed to do so, the [employees] would be eligible for regularly scheduled overtime." *Buchan*, 33 Fed.Cl. at 514. However, the plaintiffs have not alleged that the work they perform during overtime hours is habitual and routine, so that it could be regularly scheduled in advance. Nothing in the plaintiffs' appendix in support of their motion disputes the defendant's assertion that overtime "generally cannot be scheduled

more than one or two days in advance, and projected at the earliest three days in advance, because of the changing protective demands placed upon the UD." (Decl. of Richard Friedman at ¶ 10.) While the plaintiffs make much of the fact that the White House Easter Egg Roll is a foreseeable annual event at which overtime will most likely be required, they neither allege that the duties they perform at the event are habitual or routine nor allege that the UD could practically schedule this overtime by presaging the number of members who will take sick or annual leave or otherwise absent themselves from their shifts on the day of the Easter Egg Roll. The plaintiffs' appendix contains no colorable evidence that the UD could regularly schedule overtime in advance of a member's administrative workweek.

### 3. *The Armitage Holding*

Finally, the plaintiffs' *Lanehart* claim for constructive overtime fails under the *Armitage* rationale. The trial court in *Armitage* held that "the leave with pay statutes do not apply unless the agencies actually treated plaintiffs as on annual or sick leave during the regularly scheduled overtime * * * to which they claim entitlement." *Armitage*, 23 Cl.Ct. at 488. As explained above, the plaintiffs in the instant cases do not meet even the threshold requirement of *Armitage* that they work regularly scheduled overtime.[14] Moreover, even if their overtime hours were considered "regularly scheduled," it is undisputed that the plaintiffs are not charged annual or sick leave for overtime hours that they choose not to work. (Friedman Decl. at ¶ 6.) Their absence from overtime hours is simply excused, and their leave accounts are not charged. This Court finds persuasive the rationale of the *Armitage* trial court and

---

**14.** It is not disputed that some plaintiffs assigned to the Foreign Missions Branch were required to work 12–hour shifts during three periods in 1996, apparently due to increased travel by the President during the campaign season. Even if this Court were to accept the plaintiffs' contention that the overtime worked during these brief periods was regularly scheduled, the *Lanehart* overtime claim of these plaintiffs would still fail under the *Armitage* rationale adopted by this Court. The defendant has asserted, in its cross-motion and at oral arguments, that these plain-

tiffs were only charged eight hours of leave when they took a day of leave during these periods of required extended duty. They were not charged additional leave for the four hours of overtime not worked. The plaintiffs have not disputed the defendant's assertion. Because the Foreign Missions Branch plaintiffs were not charged leave for missing presumably regularly scheduled overtime during these brief periods in 1996, "the leave with pay statutes do not apply." *Armitage*, 23 Cl.Ct. at 488.

agrees that the "leave with pay" statutes at issue in *Lanehart* do not come into play if an employee is not charged leave for hours of overtime not worked.

In summary, the Court agrees with the finding of Judge Harkins in his *Amshey* Order dated August 29, 1990, that, "[u]nlike the firefighters in *Lanehart,* plaintiffs' assigned tours of duty do not include any hours of overtime that would qualify as regularly scheduled. Plaintiffs' overtime is not shown to be part of customary and regular pay, and plaintiffs are not entitled to overtime under *Lanehart.*" In addition, the Court agrees with the decision of the *Armitage* trial court and concludes that the plaintiffs are not entitled to overtime pay under *Lanehart* because they are not assessed leave when they do not work overtime hours. Accordingly, as there are no genuine issues of material fact in dispute, the Government is entitled to summary judgment on the *Lanehart* overtime claim.

### B. *The Roll–Call Claim*

■ The plaintiffs contend that they receive compensation for roll-call time that constitutes "customary and regular pay." They assert that they "are entitled to pay for roll call every pay period in which they work over 85.5 hours." (Mem. in Support of Pls.' Mot. for Summ. J. at 24.) At oral argument, the plaintiffs' counsel explained this assertion to mean that, if a member works over 85.5 hours in a two-week pay period, the UD pays the member five hours of "straight time" pay for the five hours of roll-call time that comprised part of the member's 85–hour basic work period. (Tr. at 13–14.) The plaintiffs complain that the UD, in violation of *Lanehart,* reduces this five hours of roll-call compensation when they take authorized leave.

In support of their claim that UD members are entitled to pay for their five hours of roll-call time whenever they work at least one-half hour of overtime, the plaintiffs offer the declarations of two plaintiffs. The first declaration states:

Officers are paid for the first 80 hours of their work schedule at their base hourly rate. Officers get credit for the 5 hours of roll call but they are not paid for this time

unless they work at least 85.5 hours in a pay period. However, since plaintiffs work overtime virtually every pay period, officers are entitled to pay for this roll call time for virtually every pay period of each year.

(Richard Cook Decl. at ¶ 19.) The second declaration states:

I receive one-half hour credit for roll call time each work shift. If I work over 85.5 total hours in the work period (including roll call time), I am entitled to pay for these roll call hours. Since my base schedule is 85 hours, any overtime over one-half hour will result in a work schedule exceeding 85.5 hour [sic] a pay period.

(Stephen Ridder Decl. at ¶ 8.) These declarations recite the declarants' legal conclusion that officers are entitled to pay for roll-call time. The defendant takes the position that UD members are not entitled to compensation for roll-call time, citing the D.C.Code. The parties' dispute presents a question of entitlement to pay under existing law, a legal question which may be resolved on a motion for summary judgment.

Under *Lanehart,* an employee's regular and customary pay cannot be diminished when the plaintiff takes authorized leave; to reduce regular and customary pay solely because an employee takes authorized leave would be to violate the "leave with pay" statutes. If pay for roll-call time is part of a UD member's regular and customary pay, then the member is entitled to receive this roll-call compensation when he or she takes authorized leave.

Over the course of a basic two-week pay period, each plaintiff is regularly scheduled to be on duty for 85 hours. Each plaintiff receives "straight time" pay for 80 of those hours. Five hours of each pay period constitute roll-call time, which is uncompensated. The plaintiffs do not dispute that they are not entitled to compensation for these five hours if they work no overtime in a two-week pay period. The plaintiffs contend, however, that if they work more than one-half hour of overtime in any pay period, the FLSA overtime provisions entitle them to be compensated for the five hours of roll-call time that

comprised part of their basic 85–hour pay period. (Tr. at 16.) The plaintiffs further contend that the defendant violates *Lanehart* by refusing to pay them for these five hours of roll-call time if they take authorized leave during a fourteen-day pay period. The Court finds no support in law or in the record for the plaintiffs' position.

The statute governing the pay of UD members defines roll-call time as "that time, not exceeding one-half hour each workday, which is in addition to each basic workday of the basic workweek for reading of rolls and other preparation for the daily tour of duty." D.C.CODE ANN. § 4–1104(a)(6). That statute also mandates that roll-call time "shall be without compensation or credit to the time of the basic workweek." *Id.* § 4–1104(b). The D.C.Code does not authorize an "overtime exception" to this rule. Nothing in the basic pay authority of the UD supports the plaintiffs' contention that they are entitled to compensation for their five hours of basic roll-call time whenever they work more than one-half hour of overtime in a pay period.

Similarly, nothing in the overtime provisions of the FLSA support the roll-call pay entitlement that the plaintiffs claim. Incorporating the special "tour of duty" provision applicable to law enforcement personnel, the FLSA mandates that the UD cannot employ a member for more than 85.5 hours in a 14–day period "unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. §§ 207(a)(1), (k); 29 C.F.R. § 553.230(b). The FLSA overtime provisions only address compensation for hours worked above the 85.5–hour threshold. Nothing therein requires that the UD monetarily compensate members for the five hours of roll-call time that helped the members reach that 85.5–hour threshold. Consequently, no provision of law cited by the plaintiffs entitles them to receive compensation for the five hours of roll-call time that constitutes part of their regularly scheduled 85–hour pay periods. Although roll-call is undisputedly a regularly recurring event, it does not yield customary and regular pay that would be covered by *Lanehart.*

The statements of earnings and leave submitted by the plaintiffs further show that UD members are *not* entitled to compensation for roll-call time. The plaintiffs point to a line item on these statements entitled "FLSA UD Roll Call" to support their assertion that roll-call is an item of pay that they customarily and regularly receive. However, not one of the statements submitted by the plaintiffs shows that any pay was allotted to the roll-call line item, regardless of the number of hours of overtime worked. While the number of hours of roll-call time credited to each plaintiff is recorded on the statements, no dollar amounts are allocated to the roll-call line item. This is in stark contrast to 20 or so other line items that appear on each statement, all of which list a dollar amount in the "Amount" section. These records, submitted by the plaintiffs, fully support the Government's position that UD members do not, under any circumstances, receive compensation for the five hours of basic roll-call time that comprises part of their regularly scheduled 85–hour pay periods. Indeed, compensation for this basic roll-call time would violate the express prohibition on compensation for roll-call time set out in the UD's basic pay authority, the D.C.Code.

In summary, nothing in the D.C.Code, the FLSA, the "leave with pay" statutes, or *Lanehart* supports the plaintiffs' assertion that they are entitled to compensation for their basic five hours of roll-call time during pay periods in which they work more than one-half hour of overtime and take no leave. Because the plaintiffs are not entitled to compensation for their five hours of basic roll-call time when they work their regularly scheduled 85 hours, work overtime, and take no leave, it necessarily follows that they are not entitled to compensation for that roll-call time when they work their regularly scheduled 85 hours, work overtime, and take leave. The entitlement claimed by the plaintiffs simply does not exist in the cited legal authorities. Accordingly, the defendant's motion for summary judgment is granted with respect to the roll-call claim.

## C. *The Salary Cap Claim*

The basic pay authority for the UD provides that the aggregate of a member's basic pay and premium pay (including overtime pay) cannot exceed the compensation of the Chief of Police of the District of Columbia in any pay period. D.C.CODE ANN. § 4–1104(h)(2). Thus, the D.C.Code effectively *caps* the total amount of overtime pay that may be attained by UD members every pay period. As previously mentioned, however, members of the UD are also covered by the provisions of the FLSA. The FLSA does not cap an employee's level of compensation. In calculating a member's biweekly compensation under the D.C.Code, the UD must apply the salary cap required by that pay authority. When calculating a member's entitlement to compensation under the FLSA, however, "[t]he maximum biweekly limitation on an employee's aggregate rate of pay * * * does *not* apply to employees COVERED under FLSA." Admin. Manual § PER 10(8). "To the extent that the FLSA provides the greater pay benefit [as compared to the calculation under the D.C.Code], the employees must be paid under the FLSA." *Id.* The plaintiffs allege, in this claim, that the defendant has improperly capped overtime entitlement under the D.C.Code rather than provide them with the greater benefit of the FLSA. In support of their position, the plaintiffs have submitted the earnings and leave statements of three plaintiffs [15] whose overtime entitlements have allegedly been wrongfully capped.

The defendant responds that two of the three plaintiffs offered as examples were paid overtime under the FLSA, and thus their compensation was not capped. As to the third plaintiff, Mr. Lewis C. Fox, the defendant admits that his pay was incorrectly capped during one pay period. The defendant has also submitted an earnings and leave statement showing that the error was subsequently corrected.

At oral argument, the plaintiffs' counsel did not dispute the defendant's position that two of the three plaintiffs' overtime entitlements had been calculated under the FLSA or that Mr. Fox's pay had been corrected.[16] In addition, the pay records submitted by the plaintiffs offer no support for their position that UD members are wrongfully paid under the capped D.C.Code when FLSA would provide them with a greater benefit. The plaintiffs have not disputed the defendant's showing that all three of the allegedly harmed plaintiffs were paid overtime under the FLSA rather than under the D.C.Code. The defendant has met its burden of proving that there are no genuine issues of material fact "by 'showing'—that is, pointing out to the [Court]—that *there is an absence of evidence to support the [plaintiffs'] case." Sweats Fashions, Inc.*, 833 F.2d at 1563. Accordingly, the Government's motion for summary judgment is granted with respect to the plaintiffs' salary cap claim.

## D. *The Longevity Pay Claim*

Under the D.C.Code, some of the plaintiffs are entitled to longevity pay. D.C.CODE ANN. § 4–415. Under the overtime provision of the FLSA, UD members must be paid for overtime hours at a rate of not less that one and one-half times the "regular rate" at which they are employed. The plaintiffs contend that longevity pay should be included in their "regular rate" of pay for purposes of calculating their overtime entitlement under the FLSA. The defendant agrees that longevity pay should be included in determining the FLSA overtime entitlement and concedes that the UD did not include longevity pay in the FLSA calculations between August 8, 1993, and October 27, 1996. Consequently, there is no dispute that an FLSA violation occurred: by the defendant's own admission,

---

**15.** The three allegedly harmed plaintiffs are Mr. Lewis C. Fox, Mr. Gary S. Niedzwiecki, and Mr. Charles E. Thompson.

**16.** Rather, counsel changed his argument. The plaintiffs' Complaints and Motion for Summary Judgment alleged that the UD wrongfully paid overtime under the capped D.C.Code provision instead of the uncapped FLSA provision. At oral argument on the salary cap claim, however, the plaintiffs' counsel argued that the defendant's interpretation of the FLSA resulted in underpayment of overtime in violation of *Lanehart.* (Tr. at 78–84.) The argument addressed neither the salary cap allegations asserted in the Complaint and the Motion for Summary Judgment nor the defendant's responses thereto.

some plaintiffs were not paid one and one-half times their "regular rate" for overtime hours worked between August 8, 1993, and October 27, 1996.

■ The parties disagree, however, over the applicable statute of limitations on this FLSA claim. An action for unpaid overtime compensation under the FLSA:

> may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.

29 U.S.C. § 255(a). The plaintiffs bear the burden of demonstrating that a violation was willful. *Bankston v. State of Illinois*, 60 F.3d 1249, 1253 (7th Cir.1995).

■ The defendant included longevity pay in the calculation of FLSA overtime pay prior to August 8, 1993. However, a Comptroller General decision dated May 28, 1993, instructed that longevity pay should not be included in the calculation of FLSA overtime pay. Comp.Gen.Dec. B–251235 (May 28, 1993). It is apparent that the defendant changed its position in reliance on a decision of the Comptroller General. Such reliance negates the plaintiffs' unsupported contention that the UD's failure to properly calculate overtime pay constituted a willful violation of the FLSA. *See Doyle v. United States*, 931 F.2d 1546, 1549 (Fed.Cir.1991) (concluding that trial court correctly ruled on summary judgment that the two-year statute of limitations applied where the Government relied in good faith on FLSA overtime rules). Accordingly, the two-year statute of limitations applies to the plaintiffs' longevity pay claim.[17]

■ In addition, the plaintiffs' request for liquidated damages must be denied as a matter of law. That the Government is liable to the plaintiffs on the longevity pay claim does not automatically entitle the plaintiffs to

liquidated damages. "Rather, the defendant can [avoid liquidated damages by] show[ing] that its actions were in good faith with 'an honest intention to ascertain what the Fair Labor Standards Act requires and to act in accordance with it.'" *Amos v. United States*, 13 Cl.Ct. 442, 451 (1987) (citations omitted). The defendant here has shown that its action with respect to longevity pay was in good faith, having been predicated upon the reasonable ground of a Comptroller General decision issued in response to the UD's request for guidance on the matter.

Consequently, the plaintiffs' motion for summary judgment is granted with respect to liability on the longevity pay claim. The plaintiffs are entitled to compensatory, but not liquidated, damages, subject to a two-year statute of limitations. *See* Conclusion, *infra*, pp. 572–573.

### E. *The Night Differential Claim*

■ In this claim, the plaintiffs allege that the UD incorrectly calculates their overtime under the D.C.Code by not including night differential pay in their "basic hourly rate."

The parties agree that the UD includes night differential pay in calculating overtime entitlement under the FLSA. The parties also agree that the UD does not include night differential pay in calculating overtime entitlement under the D.C.Code. The dispositive issue, then, is whether or not night differential pay must be considered as part of a UD member's "rate of basic compensation" when calculating overtime entitlement under the D.C.Code. The issue is one of statutory interpretation, which is a question of law amenable to disposition by summary judgment. *City of Tacoma*, 28 Fed.Cl. at 642.

Again, there are two distinct authorities governing the overtime compensation of UD members, the D.C.Code and the FLSA. The FLSA establishes a floor for overtime compensation. *Alexander*, 32 F.3d at 1576. At the end of a two-week pay period, a UD member's overtime compensation is calculat-

---

17. The two-year statute of limitations only affects the plaintiffs in one of the instant consolidated cases, *Adams v. United States*, No. 96–92C. The plaintiffs in that case filed their Complaint on February 14, 1996, and thus their damages are limited to the period of February 14, 1994, through October 26, 1996.

ed under the basic pay authority, the D.C.Code. If the member has been credited with more than 85.5 hours for the pay period, the member's overtime compensation is also calculated under the provisions of the FLSA to determine whether or not the overtime compensation calculated under the D.C.Code meets the requisite overtime "floor." If the FLSA calculation is greater than the D.C.Code calculation, the member is paid overtime in accordance with the FLSA calculation. If the D.C.Code calculation exceeds the floor calculated under the FLSA, the member is paid overtime in accordance with the D.C.Code calculation. The result is that, for each pay period, the member is paid overtime compensation in accordance with whichever authority provides the greater overtime benefit. Admin. Manual § PER 10(8).

The two calculations can yield different amounts because each authority requires different elements to be included in the overtime calculation. The D.C.Code provides that "overtime work shall be compensated for by payment at one and one-half times the basic hourly rate of such officer or member and all such compensation shall be considered premium pay." D.C.CODE ANN. § 4–1104(d)(1)(A). The D.C.Code does not define "basic hourly rate." It does, however, define "rate of basic compensation." "'Rate of basic compensation' means the rate of compensation fixed by law for the position held by an officer or member exclusive of any deductions or additional compensation of any kind." *Id.* § 4–1104(a)(7). From this definition, the Court interprets "basic hourly rate" to mean a member's rate of basic compensation expressed in an hourly fashion.[18] Accordingly, a UD member's "basic hourly rate" under the D.C.Code means the rate of compensation fixed by law for the member's position, expressed in an hourly fashion, exclusive of any deductions or additional compensation of any kind. A UD member is entitled to one and one-half times this basic hourly rate for each hour of overtime worked.

In contrast, the FLSA provides that overtime work shall be compensated "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. §§ 207(a)(1). The FLSA definition of "regular rate" is much more expansive than the D.C.Code's definition of "rate of basic compensation." The FLSA "regular rate" includes "all remuneration for employment paid to, or on behalf of, the employee," with the exception of seven types of compensation enumerated in the statute. 29 U.S.C. § 207(e).

Nightwork by UD members is compensated at a member's "rate of basic pay plus premium pay amounting to 10 percent of that basic rate." 5 U.S.C. § 5545(a). This 10 percent premium is referred to as a "night differential." When the UD calculates overtime entitlement under the FLSA, night differential must be included in the calculation because the differential is part of "*all* remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(e) (emphasis added). Under the D.C.Code, however, night differential is not authorized to be included in the calculation of overtime entitlement. Overtime under the D.C.Code is paid at a rate of one and one-half times the member's basic hourly rate, which excludes "additional compensation of any kind." D.C.CODE ANN. § 4–1104(a)(7). Night differential, by definition, is "premium pay," *i.e.*, additional compensation paid on top of a member's basic pay, and thus is not part of a member's basic hourly rate for purposes of calculating overtime entitlement under the D.C.Code.

In summary, the UD has not improperly calculated overtime compensation under the D.C.Code by excluding night differential from the D.C.Code overtime calculation. Night differential is not part of a UD member's "basic hourly rate" as that term is used in the D.C.Code. Accordingly, the Government's motion for summary judgment is granted with respect to the plaintiffs' night differential claim.

---

18. Rates of basic compensation are expressed in an annual fashion in the D.C.Code. D.C.CODE ANN. § 4–406(a). Because overtime is paid on an hourly basis, the "rate of basic compensation" must be translated into a "basic hourly rate" in order to calculate overtime entitlement.

## F. The Sunday Night Premium Pay Claim

 The Sunday "midnight" shift is scheduled to begin at 11:00 p.m. on Sunday night. UD members scheduled for this shift are required to report for roll-call one-half hour earlier, at 10:30 p.m. UD members who work the Sunday midnight shift that begins at 11:00 p.m. are entitled to Sunday pay for all eight hours of their shift:

> An employee who performs work during a regularly scheduled 8–hour period of service which is not overtime work as defined by section 5542(a) of this title a part of which is performed on Sunday is entitled to pay for the entire period of service at the rate of his basic pay, plus premium pay at a rate equal to 25 percent of his rate of basic pay.

5 U.S.C. § 5546(a). In addition, UD members who are regularly scheduled to work on Sunday, but who take authorized leave instead, are entitled to Sunday premium pay for the hours of leave taken. *Armitage*, 991 F.2d at 746.[19]

Occasionally, a UD member who works an earlier shift on a Sunday is also scheduled to work the Sunday midnight shift. On February 23, 1992, the UD implemented a special policy applicable to this situation. Members who had worked an earlier Sunday shift, and thus had already received Sunday pay for a shift, were directed to report for roll-call at 11:30 p.m. on Sunday, rather than at 10:30 p.m.[20] By directing these members to report for roll-call at 11:30 p.m. for a basic workday that began at midnight, the UD apparently sought to minimize payment of Sunday premium pay. *See* Order of the Chief—Uniformed Division dated Oct. 13, 1995 (Def's.App. at 68). It is undisputed that members who reported for roll-call at 11:30 p.m. were not paid Sunday pay for the basic workday that began at midnight. The UD rescinded this policy on October 13, 1995, and since that time all members have reported for roll-call at 10:30 p.m. on Sunday for the Sunday midnight shift that begins at 11:00 p.m.

The plaintiffs contend that the two members, who were directed to report for roll-call at 11:30 p.m. while the special policy was in effect, are entitled to Sunday pay for the entire eight-hour workday that began at midnight and ended at 8:00 a.m. on Monday morning. The plaintiffs base this claim on the plain language of the Sunday premium pay statute, 5 U.S.C. § 5546(a). Statutory interpretation is a question of law amenable to disposition by summary judgment.

The Sunday pay statute entitles a member to a 25 percent premium for an entire eight-hour workday if any part of the member's "regularly scheduled 8–hour period of service" is performed on Sunday. 5 U.S.C. § 5546(a). It is undisputed that the members in question reported for roll-call at 11:30 p.m. on Sunday for a workday that ended at 8:00 a.m. on Monday. The dispositive question, therefore, is whether or not the members' one-half hour of roll-call time constitutes part of their "regularly scheduled 8–hour period of service."

The UD's basic pay authority defines the "basic workweek" as "a 40–hour workweek, *excluding roll-call time*." D.C.CODE ANN. § 4–1104(a)(3) (emphasis added). The basic workweek of 40 hours must be scheduled on five days. *Id.* § 4–1104(b). A UD member's "basic workday" "means an 8–hour day *excluding roll-call time.*" *Id.* § 4–1104(a)(4) (emphasis added). "Roll-call time" is "that time, not exceeding one-half hour each workday, *which is in addition to each basic workday of the basic workweek* for reading of rolls and other *preparation for* the daily tour of duty." *Id.* § 4–1104(a)(6) (emphasis added). "[R]oll-call time shall be without compensation or credit to the time of the basic workweek." *Id.* § 4–1104(b).

---

**19.** However, Congress effectively eviscerated the *Armitage* decision in fiscal year 1997: "Notwithstanding any other provision of law, no part of any appropriation contained in this Act for any fiscal year shall be available for paying Sunday premium or differential pay to any employee unless such employee actually performed work during the time corresponding to such premium or differential pay." Pub.L. No. 104–208, § 101f (§ 630).

**20.** Of the 557 plaintiffs, 2 fall into this category. (Tr. at 102.)

The Sunday pay statute and the D.C.Code, both of which were enacted by the United States Congress, each pertains to pay entitlements for members of the UD. "The two statutes being *in pari materia*, the interpretation is preferred which best harmonizes them." *Yosemite Park and Curry Co. v. United States*, 231 Ct.Cl. 393, 398, 686 F.2d 925, 928 (1982). *See also Haig v. Agee*, 453 U.S. 280, 300–01, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981). The Sunday pay statute and the D.C.Code can best be harmonized by equating the phrase "regularly scheduled 8–hour period of service" in the Sunday pay statute to the phrase "basic workday" in the D.C. statute. Under this reasonable construction, the Sunday pay statute entitles a UD member to a 25 percent premium for an entire eight-hour workday if any part of the member's "basic workday" is performed on Sunday. A "basic workday" is eight hours, *excluding* roll-call time. If only roll-call time is performed on Sunday, then no part of the eight-hour "basic workday" is performed on Sunday, and a UD member is not entitled to Sunday pay for that "regularly scheduled 8–hour shift."

That is the precise situation at hand. The UD members in question reported at 11:30 p.m. on Sunday for one-half hour of roll-call, in preparation for their basic workday. Their basic workday of eight hours began at midnight and ended at 8:00 a.m. on Monday. Because none of the "basic workday" was performed on Sunday, the UD members are not entitled to Sunday pay for any portion of that "regularly scheduled 8–hour shift." In addition, the plaintiffs' assertion that they are entitled to Sunday pay for roll-call time scheduled on Sunday ignores their pay authority's mandate that roll-call time shall be without compensation. Accordingly, the Government's motion for summary judgment is granted with respect to the plaintiffs' Sunday night premium pay claim.

### G. *The Sunday Night Armitage Claim*

In this claim, the plaintiffs allege that, between the dates of February 23, 1992, and October 13, 1995, some plaintiffs were scheduled to report for roll-call at 11:30 p.m. on Sundays, but took leave instead. They contend that, under the holding of *Armitage*, they are entitled to Sunday pay for the leave taken during the basic workdays that would have begun at midnight and ended at 8:00 a.m. on Monday.

As explained in Part II. F., *supra*, those members who reported for roll-call at 11:30 p.m. on Sunday for a basic workday that began at midnight are not entitled to Sunday pay for either their roll-call time or their regularly scheduled eight-hour shift. Consequently, those UD members who were scheduled to appear at roll-call at 11:30 p.m. on Sunday, but who took leave instead, are not entitled to Sunday pay for either the roll-call time or the basic workday during which they were absent. If a member would not have received Sunday pay had he actually worked a regularly scheduled eight-hour shift, he is certainly not entitled to Sunday pay if he takes leave during that shift. The plaintiffs' argument finds no support in *Armitage* or the "leave with pay" statutes, and, therefore, the Government's motion for summary judgment is granted with respect to the Sunday night *Armitage* claim.

### CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss the *Lanehart* overtime claim with respect to 227 plaintiffs on collateral estoppel grounds is granted. The 227 affected plaintiffs are listed in Appendix A of this Opinion. The defendant's motion for summary judgment with respect to the *Lanehart* overtime claim of the remaining plaintiffs is granted. The defendant's motion for summary judgment is also granted with respect to the following: the roll-call claim, the salary cap claim, the night differential claim, the Sunday night premium pay claim, and the Sunday night *Armitage* claim. *See supra* p. 556. The night overtime claim and sergeants' overtime claim, having been withdrawn by the plaintiffs, are to be dismissed with prejudice. *See supra* notes 6 and 7. There being no just reason for delay, the Clerk of the Court is directed to enter final judgment, dismissing with prejudice the eight aforementioned claims with respect to all 557 of the plaintiffs in these consolidated

cases. *See* RCFC 54(b). All 557 plaintiffs are listed in Appendix B of this Opinion.

With respect to the longevity pay claim, the plaintiffs' motion for summary judgment is granted, subject to a two-year statute of limitations and limited to compensatory damages only. The defendant has represented that it has requested the National Finance Center to calculate the back pay entitlement for those plaintiffs who were affected by the UD's failure to include longevity pay in the FLSA overtime calculations between August 8, 1993, and October 27, 1996. (Tr. At 94–95.) The parties are directed to file a joint status report, or individual status reports if agreement cannot be reached, with this Court no later than 60 days after the date of this Opinion. In the report(s), the parties shall express their views regarding the acceptability of the results of the National Finance Center calculations and the necessity of further judicial intervention required in resolving the quantum of damages. Final judgment, with respect to this longevity pay claim only, shall be held in abeyance pending this Court's assessment of the status report(s) called for above.

## APPENDIX A

*Abbott v. United States, No. 94–651 C*

Plaintiffs Estopped from Arguing *Lanehart* Overtime Issue

*Abbott v. United States, No. 94–651C*

| | | | |
|---|---|---|---|
| 1. | Bruce E. Abbott | 38. | Earl A. DiLulio |
| 2. | William D. Ayers | 39. | Ronald J. Elie |
| 3. | Philip M. Baird | 40. | Michael J. Emrick |
| 4. | Michael W. Baker | 41. | Charles E. Faulconer |
| 5. | Daniel J. Barnwell | 42. | Anthony J. Ferrara |
| 6. | Leo J. Barton | 43. | Lewis C. Fox |
| 7. | Jeffrey L. Bazin | 44. | Stephen J. Franchak |
| 8. | Claude Edward Beacht | 45. | Robert P. Franz |
| 9. | Robert A. Bonasia | 46. | Sherrine E. Freeman |
| 10. | Thomas Brady | 47. | Bernard K. Garrettson, Jr. |
| 11. | Cecil G. Bradshaw | 48. | Raymond J. Gillespie |
| 12. | Richard H. Branch | 49. | Lewis M. Greenberg |
| 13. | Seth A. Breger | 50. | Rita C. Hamon |
| 14. | David G. Butz | 51. | Anthony B. Heider |
| 15. | Kenneth J. Calder | 52. | Jeffrey J. Herzog |
| 16. | Larry C. Carbone | 53. | Jeffrey A. Hill |
| 17. | Martin T. Carbone | 54. | Mark D. Horsley |
| 18. | William J. Carlson | 55. | Bernard W. Jones, Jr. |
| 19. | John Casucci | 56. | Mark S. Joyce |
| 20. | Terrence C. Chambers | 57. | G. Wayne Koenig |
| 21. | John Chicoski | 58. | Christopher Kopf |
| 22. | Stanley R. Cisiewicz | 59. | Vincent W. Kosich |
| 23. | Kevin P. Cleary | 60. | Douglas F. Kravos |
| 24. | Robert A. Clements | 61. | George A. Kurutz |
| 25. | Dale M. Cockayne | 62. | William C. Lind |
| 26. | Manfred R. Cody | 63. | Warren L. Loveland |
| 27. | Louis M. Condatore | 64. | John Robert Lowe |
| 28. | Richard A. Cook | 65. | William P. Ludtke III |
| 29. | C. Andrew Cudahy | 66. | James E. Luensman |
| 30. | Richard S. Dana | 67. | Thomas E. Mach |
| 31. | Garry H. Dargan | 68. | Harley J. Manchester |
| 32. | Earl L. Davy | 69. | Camillo Mascio |
| 33. | J. David Deardorff | 70. | Gary L. Matcheson |
| 34. | Anthony P. Debellis | 71. | William D. Mattingly, Jr. |
| 35. | Anthony R. DeMasi | 72. | Michael McAllister |
| 36. | Arthur A. Denman, Jr. | 73. | Marshall Wayne McCall |
| 37. | Richard Depriest | | |

74. Stephen G. McCormack
75. Dennis G. McCullough
76. Peter D. McRae
77. Clifton C. Mills
78. Joseph C. Molinaro
79. Richard L. Morse
80. Ronald A. Musolino
81. Gary S. Niedzwiecki
82. James W. O'Hanley
83. Manuel R. Ovalle
84. Joseph M. Potack
85. John 0. Quesinberry
86. Eliqio Quirindongo
87. Donald F. Racine
88. Terry D. Register
89. Ronald Phillip Regulski
90. Michael W. Rice
91. William S. Rick
92. James M. Ricks
93. Richard G. Ruel
94. Hector L. Santiago
95. Mary V. Santoro
96. Thomas C. Santoro
97. Keith B. Sapack
98. Charles Paul Scherer
99. Alfred H. Schoonmaker
100. Arnold N. Schwartz
101. Henry L. Sergent
102. James J. Shea, Jr.
103. William Shegogue
104. John M. Sibenik
105. Alan L. Skinner
106. John S. Skyles
107. Herman A. Sloan
108. Steven C. Smith
109. Richard W. Snowden
110. Linda M. Suarez
111. Scott T. Summerford
112. William P. Supples, Sr.
113. Richard C. Surles
114. Stephen P. Suter
115. Joseph John Syreika
116. Henry Thomas
117. Charles E. Thompson
118. Lonnie R. Tincher
119. Joseph A. Toriskie, Jr.
120. Rodger W. Touw
121. Douglas W. Tuxbury
122. August Vagnini, Jr.
123. Jamie X. Velasco
124. William J. Wallace
125. Alfred D. West
126. Lynn M. Whisler, Jr.
127. Stephen F. White
128. Henry B. Williams, Sr.
129. Wesley D. Williams
130. Floyd W. Willis
131. Jerry W. Winstead
132. James L. Woodland
133. Stanley J. Wzientek

*Acosta v. United States, No. 95–475C*

1. Lamont S. Baxter
2. Franklin C. Beal
3. Joseph T. Boyer
4. John P. Braddy
5. John P. Brophy
6. Ronald B. Caldwell
7. James W. Canby
8. Cynthia T. Carter
9. H.L. Carter
10. John D. Cooper
11. James E. Courtney
12. Joseph F. Crato
13. Ronald Q. Crossman
14. Bruce Neal Curtis
15. William H. Curtis
16. Clifton C. Cusick
17. Danny L. Day
18. Daniel J. Diefenbach
19. Robert H. Doe
20. James Domowicz
21. Kevin L. Duncan
22. Eugene Edward Ellington, Jr.
23. Rickey A. Flowers
24. Terry A. Gavazzi
25. Rodney K. Gillette
26. Jerry A. Giovinazzo, Sr.
27. Michael E. Hatfield
28. Melvin C. Jackson
29. Nicole Wilhite Jones
30. Robert A. Jones
31. Lawrence A. Julian
32. William A. Keaveney
33. David K. Kielbasa
34. Earl E. Knickelbein, Jr.
35. Richard Krason
36. William E. Kreiger
37. Thomas W. Kurtz
38. Aloysius F. Lanahan
39. John J. Langan
40. Orlando J. Lawson
41. Louis A. Mason
42. John A. Mayer
43. Jeffrey L. McQuain
44. Dennis M. Moore
45. George E. Morris
46. Jack D. Motley, Jr.
47. Andrew J. Mutcher
48. Ernest A. Navarra, Jr.
49. Francis D. Nerdahl
50. Lorenzo Nichols, Jr.
51. John Anthony Parker

52. Samuel N. Parker
53. Michael T. Piepoli
54. Paul W. Pilkerton
55. James A. Powell
56. Peter Gerard Regan
57. Robert W. Ridgeway, Sr.
58. Steven R. Rouscher
59. Charles M. Sabruno
60. James E. Scott
61. Francis Sheehan
62. Paul D. Sibenik
63. Earl L. Silverstein
64. David M. Simpson
65. Kevin Smith
66. Raymond F. Snyder
67. James A. Steward
68. Randall R. Sweetland
69. Robert F. Taylor
70. Charles E. Team
71. Cheryl L. Thompson
72. Michael Patrick Thompson
73. Charles Transou
74. John D. Trent
75. William M. Vucci
76. Kathy A. Wiest
77. Robert T. Worrier
78. Charles R. Wood
79. Scottie R. Wright

*Adams v. United States, No. 96–92C*

1. Nancy L. Anderson
2. John David Bicjan
3. Mark A. Buchholz
4. Robert G. Gustin
5. Patrick Frank Kurtz
6. George M. Lee, Jr.
7. John F. McRoberts
8. Robert E. Nixon
9. Henry P. O'Neill, Jr.
10. Ronald L. Quarto
11. William Shegogue
12. Tommy L. Taylor
13. Deon M. Thompson
14. Victor P. Tomsko
15. Edward W. Warzywak

## APPENDIX B
Plaintiffs to the Consolidated Cases

*Abbott v. United States, No. 94–651C*

1. Bruce E. Abbott
2. Anthony M. Angerome
3. William D. Ayers
4. Philip M. Baird
5. Michael W. Baker
6. Eric N. Balch
7. Daniel J. Barnwell
8. Leo J. Barton
9. Jeffrey L. Bazin
10. Claude Edward Beacht
11. Michael G. Belasco
12. Nicholas J. Bock
13. Robert A. Bonasia
14. Thomas Brady
15. Cecil G. Bradshaw
16. Richard H. Branch
17. Seth A. Breger
18. Jose A.M. Brown
19. David G. Butz
20. Kenneth J. Calder
21. John J. Campbell
22. Larry C. Carbone
23. Martin T. Carbone
24. William J. Carlson
25. John Casucci
26. Terrence C. Chambers
27. John Chicoski
28. Stanley R. Cisiewicz
29. Kevin P. Cleary
30. Robert A. Clements
31. Dale M. Cockayne
32. Manfred R. Cody
33. Louis M. Condatore
34. Richard A. Cook
35. Michael A. Corcione
36. Carlos M. Cruz
37. C. Andrew Cudahy
38. Jeffrey D'Alessio
39. Richard S. Dana
40. Garry H. Dargan
41. Earl L. Davy
42. J. David Deardorff
43. Anthony P. Debellis
44. Wilfredo Dejesus
45. Michael V. Delcoco
46. Ronald R. Delfidio
47. Anthony R. DeMasi
48. Arthur A. Denman, Jr.
49. Richard Depriest
50. Richard C. DeTamble
51. Earl A. DiLulio
52. Daniel F. Dluzneski

53. Steven J. Dwyer
54. Ronald J. Elie
55. Michael J. Emrick
56. Michael P. Farran
57. Charles E. Faulconer
58. Anthony J. Ferrara
59. William H. Finigan, Jr.
60. Lewis C. Fox
61. Mark Frantzen
62. Stephen J. Franchak
63. Robert P. Franz
64. Sherrine E. Freeman
65. Bernard K. Garrettson, Jr.
66. Raymond J. Gillespie
67. Lewis M. Greenberg
68. James L. Guidry
69. William M. Gunter
70. Rita C. Hamon
71. Martin L. Hanna
72. Anthony B. Heider
73. Jeffrey J. Herzog
74. Jeffrey A. Hill
75. Mark D. Horsley
76. Thomas R. Howie
77. Ralph D. Huffstickler
78. Derrick J. Jeanmarie
79. Lance K. Johnson
80. Barnard W. Jones, Jr.
81. Mark S. Joyce
82. Bruce K. Keller
83. Paul Michael Kmiotek
84. Richard T. Knox
85. G. Wayne Koenig
86. Christopher Kopf
87. Vincent W. Kosich
88. Douglas F. Kravos
89. George A. Kurutz
90. Edward A. Lavalle
91. William C. Lind
92. Warren L. Loveland
93. John Robert Lowe
94. William P. Ludtke III
95. James E. Luensman
96. Thomas E. Mach
97. Harley J. Manchester
98. Camillo Mascio
99. Gary L. Matcheson
100. Max T. Mattern
101. William D. Mattingly, Jr.
102. Michael McAllister
103. Marshall Wayne McCall
104. Stephen G. McCormack
105. Dennis G. McClullough
106. James J. McGuire
107. Richard W. McLarney
108. Peter D. McRae
109. Charles S. Miller
110. Clifton C. Mills
111. Joseph C. Molinaro
112. Richard L. Morse
113. Samuel H. Murray, Jr.
114. Ronald A. Musolino
115. William W. Nelson
116. Gary S. Niedzwiecki
117. James W. O'Hanley
118. Manuel R. Ovalle
119. Neftali Pabon
120. Steven P. Pape
121. Carl A. Persons
122. Kevin S. Porter
123. Joseph M. Potak
124. John O. Quesinberry
125. Eliqio Quirindongo
126. Donald F. Racine
127. Terry D. Register
128. Ronald Phillip Regulski
129. Michael W. Rice
130. William S. Rick
131. James M. Ricks
132. Stephen R. Ridder
133. Richard G. Ruel
134. Thomas H. Salzer
135. Hector L. Santiago
136. Ismaei Diaz Santiago
137. Mary V. Santoro
138. Thomas C. Santoro
139. Keith B. Sapack
140. Charles Paul Scherer
141. Alfred H. Schoonmaker
142. Arnold N. Schwartz
143. Henry L. Sergent
144. Teresa S. Sergent
145. James J. Shea, Jr.
146. William Shegogue
147. John M. Sibenik
148. Harris Silverstein
149. Kevin S. Simpson
150. Alan L. Skinner
151. John S. Skyles
152. Herman A. Sloan
153. Steven C. Smith
154. Richard W. Snowden
155. Linda M. Suarez
156. Scott T. Summerford
157. William P. Supples, Sr.
158. Richard C. Surles
159. Stephen P. Suter
160. Joseph John Syreika
161. John J. Tarr
162. Gary A. Therkildsen
163. Henry Thomas
164. Charles E. Thompson
165. Lonnie R. Tincher
166. Joseph A. Toriskie, Jr.
167. Rodger W. Touw
168. Douglas W. Tuxbury

169. August Vagnini, Jr.
170. Jamie X. Velasco
171. Paul D. Verna
172. William J. Wallace
173. Alfred D. West
174. Lynn M. Whisler, Jr.
175. Stephen F. White
176. Henry B. Williams, Sr.
177. Wesley D. Williams
178. Floyd W. Willis
179. Jerry W Winstead
180. James L. Woodland
181. Stanley J. Wzientek
182. Donald F. Zywiolek

*Acosta v. United States, No. 95–475C*

1. Juan R. Acosta
2. Richard B. Alexander
3. Eric T. Alston Jr.
4. Christopher Jay Anglim
5. Jeffrey Anglim
6. Trevor Martin Antolik
7. John F. Arnold
8. Shaun Brian Aslaksen
9. John Bain, Jr.
10. Steven B. Baker
11. Gregory W. Ballard
12. Robert J. Barrett
13. Lamont S. Baxter
14. Franklin C. Beal
15. William J. Bednarek
16. Phillip M. Barnal
17. Rebecca A. Barnal
18. Dennis G. Berry
19. Mark David Bibelhauser
20. Timothy Bines
21. Brandon Blucher
22. James Bolding
23. Laurence Allan Boorom
24. Kenneth J. Bouley
25. Joseph T. Boyer
26. John P. Braddy
27. Sid A. Branham
28. Michael Braun
29. Carla F. Broddie
30. John P. Brophy
31. Jose A. Macklin Brown
32. Gary Scoff Buwalda
33. Ronald B. Caldwell
34. James W. Canby
35. Robert Caraballo
36. James V. Carpenter
37. Cynthia T. Carter
38. H.L. Carter
39. Jarrod Cassetta
40. William Cavallaro
41. Daniel P. Chearney
42. William S. Cherry
43. Robert B. Chick
44. Donald J. Clark
45. Paul R. Cole
46. George W. G. Colvin III
47. Christopher A. Cook
48. Michael D. Cooley
49. John D. Cooper
50. James E. Courtney
51. Joseph F. Crato
52. Ronald Q. Crossman
53. Bruce Cummings
54. Dante Cunningham
55. Ralph L. Cunningham
56. Bruce Neal Curtis
57. William H. Curtis
58. Clifton C. Cusick
59. Craig M. Cygan
60. Allan C. Dale
61. Danny L. Day
62. Timothy K. Davis
63. Everett K. Deanes
64. John J. DelPilar
65. Eliezer Diaz
66. Daniel J. Diefenbach
67. Robert H. Doe
68. James Domowicz
69. James Driscoll
70. Mark A. Dudurich
71. Kevin L. Duncan
72. Nelson M. Durham
73. Alfonso M. Dyson, Sr.
74. Eugene Edward Ellington, Jr.
75. Mark Embrey
76. Sammy Alvin Escamilla
77. Thomas K. Fante
78. Timothy F. Flicker
79. Rickey A. Flowers
80. Steven J. Forrester
81. Paul F. Foster
82. Wade N. Fournier
83. Marvin L. Fowlkes, Jr.
84. Jeffrey Lynn Fox
85. Aldo E. Frascoia II
86. Gwendolyn Freeman
87. Todd D. Gabryszak
88. Nicholas V. Garland
89. Patrick J. Gawlik
90. Terry A. Gavazzi
91. Scott R. Giambattista

92. William J. Gibson
93. Rodney K. Gillette
94. Jerry A. Giovinazzo, Sr.
95. David K. Grant
96. Reginald Green
97. Darryl J. Grogan
98. Thomas M. Gula
99. Jerry A. Hales
100. John Michael Hammersla
101. Joseph N. Hamrick
102. Jill M. Hanley
103. Michael A. Hanlon
104. James B. Harper
105. Michael B. Hatfield
106. Charles C. Herman
107. Edward A. Herrmann
108. Robert E. Heverly, Jr.
109. Harvey Wayne Hines
110. James Hitchcock, Jr.
111. Michael A. Hodapp
112. Tara L. Horne
113. Charles A. Howell
114. Henry B. Hubbard III
115. Melvin C. Jackson
116. Michael H. Jervis
117. David E. Jezioro, Jr.
118. Allen B. Jones
119. Johnny Calvin Jones
120. Nicole Wilhite Jones
121. Robert A. Jones
122. Thomas M. Jones
123. Larry W. Joyce
124. Virginia C. W. Joyce
125. Lawrence A. Julian
126. Eric E. Kandrashoff
127. Martin J. Karlavage, Jr.
128. William A. Keaveney
129. Thomas J. Kelly
130. Trent L. Keltner
131. David K. Kielbasa
132. Steven I. Kimble
133. Roger W. Kingston
134. Jeffrey E. Kleinsmith
135. Earl E. Knickelbein, Jr.
136. Henry A. Koontz
137. Richard Krason
138. William E. Kreiger
139. Thomas W. Kurtz
140. Anthony M. LaBosco
141. Aloysius F. Lanahan
142. John J. Langan
143. Michael L. Laury
144. William J. LaValley
145. Jeffrey M. Lavorgna
146. Orlando J. Lawson
147. Gregory Alan Leidner
148. David Bruce Levine
149. Brian C. Lippert
150. Tamara D. Little
151. James R. Lockrow, Jr.
152. Earnest Braxton Lomax
153. Naomi Lou Lyons
154. Patrick Thomas Lyons
155. David Marsh
156. Gregory W. Martin
157. George L. Mason
158. Louis A. Mason
159. Joseph Matos
160. John A. Mayer
161. Jeffrey T. Mayo
162. Christen L. McBeth
163. Karnel D. McMahan
164. Paul B. McNorris, Jr.
165. Jeffrey L. McQuain
166. Michael T. Merritt
167. Terrence D. Minor
168. Steven Mitchell
169. James R. Monskie
170. Dennis M. Moore
171. Steven Moore
172. George E. Morris
173. Brian E. Morrissey
174. Arthur L. Motley
175. Jack D. Motley, Jr.
176. Thomas M. Muldoon
177. Wayne J. Mullins
178. Laura L. Murray
179. Andrew J. Mutcher
180. Todd M. Nassoiy
181. Ernest A. Navarra, Jr.
182. Paul W. Neal
183. Francis J. Nedeau–Slattery
184. Francis D. Nerdahl
185. Garry Nichols
186. Lorenzo Nichols, Jr.
187. Norine Nightingale
188. James D. Oman
189. Enrique Ortiz
190. Israel Ortiz
191. Michael Overstreet
192. Thomas F. Owens
193. John Anthony Parker
194. Samuel N. Parker
195. Francis E. Peckay
196. Edward G. Phillips
197. Jeffrey A. Pickard
198. Michael T. Piepoli
199. Paul W. Pilkerton
200. Danny P. Plaisance
201. James A. Powell
202. Jack H. Powers
203. Thomas M. Radtke
204. David K. Rath
205. Peter Gerard Regan
206. Dennis W. Richardson
207. Robert W. Ridgeway, Sr.

208. Michael C. Rife
209. Richard A. Roberts
210. Ronald E. Rockefeller, Jr.
211. Kim Rohlfs
212. William George Roode
213. Robert James Ross, Jr.
214. Robert W. Ross
215. Steven R. Rouscher
216. William J. Ryan
217. Charles M. Sabruno
218. Anthony K. Saltaformaggio
219. Luigi P. Salvi
220. Timothy E. Sampson
221. Trent A. Sanders
222. James C. Sartor
223. Samuel C. Schrader
224. Anthony J. Scott, Jr.
225. James E. Scott
226. James F. Shallow, Jr.
227. Francis Sheehan
228. Colin E. Shipley
229. Paul D. Sibenik
230. Earl L. Silverstein
231. David M. Simpson
232. Teeka Singh
233. Kevin T. Smith
234. William R. Snow
235. Dale L. Snyder
236. Raymond F. Snyder
237. Francis C. Sobol
238. Ted H. Sparks
239. James A. Steward
240. J. Kelly Stewart
241. John Albert Stockwell
242. William W. Streaker
243. Stephen J. Stretmater
244. James J. Stumpf
245. Randall R. Sweetland
246. Bradley T. Taylor
247. Cynthia E. Taylor
248. David M. Taylor
249. Robert F. Taylor
250. Charles E. Team
251. Henry Tejada
252. D.J. Ternovan
253. Jeffrey T. Thern
254. Edward G. Thomas, Jr.
255. Brenda Thompson
256. Cheryl L. Thompson
257. Michael Patrick Thompson
258. Jeffrey Thomsen
259. Arthur J. Tomlin
260. Todd Tracy
261. Charles Transou
262. John D. Trent
263. Donald E. Tringali
264. Jeffrey R. Trudel
265. Antonio Trujillo
266. Christopher A. Tutka
267. Philip M. Tylicki
268. Steven Tyner III
269. Eric J. Ukleja
270. Michael P. Ursiny
271. Sandra J. Verna
272. Michael A. Vigorito
273. James E. Voelker
274. William M. Vucci
275. Neil Wagoner
276. Carmen Lynn Walker–Ortiz
277. Darryl R. Ward
278. Diane M. Warrenfeltz
279. Daryl L. Warrenfeltz
280. Eddie B. Weathers
281. Glenn R. Webb
282. Daniel D. Wehrmeyer
283. Kathy A. Wiest
284. Harry O. Wilson
285. John J. Wojtanowski
286. Robert T. Womer
287. Charles R. Wood
288. Scottie R. Wright
289. Kevin Allan Yentz

*Adams v. United States, No. 96–92C*

1. Nancy L. Anderson
2. Michael T. Appleby
3. Shaun Brian Aslaksen
4. Michael E. Baltzley
5. Laura A. Bell
6. John David Bicjan
7. Stephen V. Bittner, Jr.
8. Harold E. Bondurant
9. James A. Brazill, Jr.
10. Miles D. Brey
11. Stephen W. Brown
12. Mark A. Buchholz
13. William M. Cahill
14. Robert B. Conley
15. Ronald L. Craig
16. Judson J. Dengler
17. David M. Dumont
18. Daryl Duncan
19. Keith M. Finzel
20. Anthony R. Flippo

21. Sherrine E. Freeman
22. David L. Garrett
23. Robert W. Gibson
24. Joan W.K. Greenberg
25. Ruben S. Gresham
26. Robert G. Gustin
27. William F. Healy
28. George A. Heitz
29. Glenn Hooper
30. Nancy A. Hopkins
31. Dawn A. Hovington
32. Keith R. Johnson
33. Francis J. Kenny
34. David M. Kohl
35. Christopher T. Kreisher
36. Patrick Frank Kurtz
37. Gregory John La Dow
38. George M. Lee, Jr.
39. Patrick Joseph Lesiak
40. William C. Lindsey
41. Benita Antoniette Lyons
42. Michael J. McAleer
43. Robert P. McCabe
44. James McGinn
45. John F. McRoberts
46. Mark T. Moody
47. William A. Mullen
48. Larry Murdock
49. Yolanda H. Nelson
50. Robert E. Nixon
51. Henry P. O'Neill, Jr.
52. Joe B. Overstreet
53. Edward M. Pacich

54. Michael D. Parise
55. Ramen Perez
56. Ronald L. Quarto
57. Paul A. Rappa
58. Richard Rosa
59. Donald S. Roscoe
60. Scott K. Scherer
61. Damian W. Schwartz
62. William Shegogue
63. Marjorie C. Smith
64. Leroy E. Snyder
65. Christian Stanton
66. Wallace Crown Strong
67. Joseph E. Stump
68. Thomas J. Sullivan
69. Tommy L. Taylor
70. Deon M. Thompson
71. Victor P. Tomsko
72. Carlos Antonio Torres
73. Jill E. Turner–Dumont
74. Sheila M. Tyson–Price
75. Edward B. Valente
76. Johnny Vasquez
77. W. Gary Walker
78. Edward W. Warzywak
79. Eugene K. Weedon
80. William M. Webster
81. Scott R. Wenham
82. Danny I. White
83. Derek D. Williams
84. Thomas A. Williams
85. William B. Winans
86. Renee M. Wolfer

### APPENDIX C

Former Plaintiffs Dismissed With Prejudice Pursuant to RCFC 37 and 41(b)

*Abbott v. United States, No. 94–651C*

1. William R. Burke
2. William R. Castle
3. Ronald C. Dame
4. William R. Dykes, Jr.
5. Stephen Hanley
6. Joseph K. Holloman

7. John E. Howard
8. Edward T. Hruneni
9. Peter T. McElhinney
10. Russell C. Mortiz
11. Samuel M. Yarosh

*Acosta v. United States, No. 95–475C*

1. Terri D. Blocker
2. Yvette Burwell
3. Robert J. Goewey III
4. Andre K. Gray
5. Tyrus E. Harris

6. Oliver R. Hemsley
7. Timothy James Hennessey
8. Michael w. Herndon
9. Richard Thomas Hresko
10. Burton F. Jackson

11. John E. King
12. Manuel Lopez, Jr.
13. Robert J. Marshall
14. Lawrence Martin
15. Edward A. Melerski
16. Patricia Myers
17. Freeman Myles, Jr.
18. Keith D. Olive
19. Thomas E. Russell
20. Alexander Sandoval
21. Joseph R. Tutka
22. Donald K. Vann
23. Jacqueline D. Varner
24. Hugh E. Wilkerson
25. Mathew H. Wilson
26. Ross L. Wuthrich

*Adams v. United States, No. 96–92C*

1. Cleveland Adams, Jr.
2. Roger L. Blankenship
3. Brent J. Chinery
4. Bernard O. Hackney
5. Danny Hauk
6. Timothy Jacobs
7. Terryll C. Montgomery
8. Valerie Szabo
9. Garrick P. Valdes
10. Frank E. Walkup
11. Bryant O. Withrow, Jr.